Thomas Lewis, appellant, *vs.* John B. Moffett, appellee.

*Appeal from Sangamon.*

If it is expressly agreed, that a partner is not to give his personal services for the benefit of the firm, he may recover from his copartners for services rendered the joint concern, at their instance and request.

On the 14th October, 1848, John B. Moffett filed in the office of the clerk of Sangamon county Circuit Court, his bill in chancery against Thomas Lewis and Willis H. Johnson, in which it was alleged, that on the 1st February, 1848, said Lewis, Johnson and the complainant entered into written articles of copartnership, as follows:

"Articles of copartnership entered into this day between Thomas Lewis and Willis H. Johnson, and John B. Moffett, all of the city of Springfield, Illinois, under the style of Lewis, Johnson & Co.:

" *Article First.* Each party to invest one thousand dollars in stock or cash, making a capital of three thousand dollars, which may be increased. *Secondly.* Each partner to share equal in the profits or loss of the foundry and machine business. *Thirdly.* The said Lewis agrees, in lieu of his services, to furnish the foundry and machine shop now occupied by Lewis & Johnson, free of rent, and purchase stock for the concern in St. Louis, when there, free of charge to the firm. *Fourthly.* The said Johnson will be expected to devote his entire time to the mechanical interest of the concern, except such time as his private business requires. *Fifthly.* The said Moffett will be expected to devote his entire time to the financial and mechanical interest of the concern, except such time as his private business requires. *Sixthly.* It is understood and agreed, that for a valuable consideration by the said John B. Moffett to Lewis & Johnson paid, that the said J. B. Moffett is to be entitled to the one undivided

one-third part of interest in Willis H. Johnson's patent pump, for whatever territory may remain unsold in the U. S., on the first of February next; also, in the event of Lewis & Johnson obtaining a patent for a churn that they have applied for, said right is to belong equally to the firm of Lewis, Johnson & Co., as well as an electro-magnetic machine that the company are now building. *Lastly.* That the firm is to continue so long as the parties may agree or desire its continuance, unless dissolved by Providential dispensation."

The firm was dissolved by mutual consent, August 3, 1848. The complainant further alleges, that at the time the said co-partnership was entered into, the said Lewis & Johnson were expecting to obtain a patent for an atmospheric churn, and sets out so much of the sixth article as provides, that in the event of obtaining said patent, the right was to belong equally to the firm. That it was then contemplated and intended by said Lewis, Johnson & Co., to sell their interest in said patent as opportunity offered, and their interest would seem to require, and equally to divide the proceeds arising from the sale, after paying necessary expenses attending the same. Charges that the complainant, by said agreement, became entitled to one-third of said proceeds; that the said patent issued in May, 1848; that no conversation was ever held or agreement made in reference to any one of the partners acting in the capacity of an agent for the firm; that Thomas Lewis, having private business in St. Louis, concluded to take said churn, which he, complainant, had prepared, with him to St. Louis, and, if an opportunity should offer, to sell the rights acquired by the said patent; that said Lewis, upon his arrival in St. Louis, sold rights to sundry individuals, for cash, notes, and property; and charges that whatever Lewis did, he did as partner of the firm of Lewis, Johnson & Co.; that there never was any agreement between the members of said firm, by which said Lewis was recognized as agent of the firm; nor any agreement to allow him any extra compensation for his services, nor commissions on the sales which he made; but that whatever was done by him was done under those general rules and regulations by which partnerships are governed. The bill then sets forth, as the complainant alleges, a general statement of the amount of notes and articles for which rights were sold—making the gross amount $ 5,047, as

50

near as complainant could ascertain the same; that the statement contains the nominal amount at which the property was received, but in consequence of the manner in which the rights were sold, and the anxiety on the part of Lewis to effect sales, but little regard was had to the actual value of the property received in exchange; that the real estate is not worth one half the amount at which it was received, and that a liberal deduction should be made from the nominal value of the personal property. Further, that the sales were effected in the latter part of May and the commencement of June, 1848; that on the 7th of July, 1848, the partners divided the real estate, by bidding against each other for the same; that the depreciation below the nominal amount at said division was $5,387; besides which, there were sixty quarter sections, situated in Missouri, of which each partner took twenty, at the nominal value of $6,000; but, as the complainant believes, were not worth $3,000—making a total depreciation on real estate of $8,387; that on August 7, 1848, a like division of part of the personal property was made, in same manner, and taken by the partners at greatly reduced rates, which complainant alleges to be nearly their real value; that the other part of the personal property was sold for cash at different times, which was invariably retained by Lewis, and complainant filed, as he alleged, a copy of a statement, showing the amount of sales, description of property, disposition of same, nominal prices, and the prices at which the same were taken by the respective partners. Alleges that in said divisions, property was taken, part at its real value and part at a nominal value, amounting to $4,256, according to the statement filed with his bill, but which he alleges does not exceed in value $3,000; and that this is all that complainant has obtained from the proceeds of said partnership enterprize; that at said division, Johnson obtained property amounting to $3,659 88, and said Lewis to the amount of $9,911 67, according to exhibit filed by complainant with his bill; that besides the amount of property above stated as having been obtained by Lewis, he, Lewis, retained possession of notes amounting to about $17,806 70, and the control of a judgment of $530, and a mortgage of $520; that Lewis utterly refuses to make a division of the same, or make further settlement with the other partners of the firm, but demands one-third of the gross proceeds of sales, or about $17,000, as commis-

sions for his attention to the partnership business.  The com-
plainant then prays that Lewis & Johnson be made defendants,
and answer severally, and Lewis be required fully to account;
that an equitable division of notes be made among the several
partners, or that a receiver be appointed to receive and divide
the proceeds from time to time, according to the terms of the
partnership, by allowing to each partner one-third of the pro-
ceeds ; that said Lewis be allowed only his necessary expenses
for attending to the business of the firm, and that no allowance
be made as extra compensation or commissions for his attention
to the partnership business, and such other and further relief,
&c.

On the 15th of January, 1849, Thomas Lewis filed his answer,
under oath, in which he admits that the written articles of co-
partnership filed with complainant's bill, are the only written
articles ever executed by them, and that the same contained the
true terms of the partnership; that at the time said article was
entered into, it was in contemplation of Lewis & Johnson to
obtain a patent for an atmospheric churn, and that when the
same was obtained the right was to belong equally to the firm of
Lewis, Johnson & Co., and that said patent was obtained ; and
asserts that complainant, without the knowledge of his partners,
kept his son in Springfield, with the expectation of sending him
out to sell said rights, at the usual pay of an agent—one-half of
the proceeds.  He further states, that he was about visiting St.
Louis on business of the firm of Lewis & Adams, and at the re-
quest of the complainant, and his co-defendant, Johnson, defer-
red his visit until a churn could be prepared for him ; that after
the churn was prepared, he did proceed to St. Louis, and there
disposed of the rights to said churn.  He expressly denies that
he transacted said business and disposed of said rights, sold by
him, in his capacity as partner in said firm of Lewis, Johnson &
Co., but as the agent of said firm, for the sale of said rights, and
with the expectation of receiving commissions therefor, as agent ;
further, that he was under no obligation to render his services
or devote his time for the benefit of said firm—such being the
express provision of the partnership—and, also, independent of
the written article, the express understanding of all the partners.
He further states, that had he not acted for said firm, as agent
for the sale of these rights, they would necessarily have been

compelled to have employed agents therefor, and paid them one-half of the proceeds of the sales—such being the usual commission to agents—which expenses must have been deducted from the amount before the partners could share the remainder. He claims, and by his answer insists upon, his right to retain one-third of the proceeds of sales, for his commissions as agent aforesaid; that he remained several weeks in St. Louis upon this express business, and so remained at the earnest solicitations of complainant and Johnson, urging him not to return until he had disposed of the entire right; and complainant urging him not to return so long as he could make sales; that in making sales he used his utmost endeavors to promote the interest of the concern, and in his exchanges for property, made the best trades he could; does not believe that any other agent would have realized one-third as much as he did; that at the time of the sales, he was bound by his agreement with the firm of Lewis & Adams, to devote his time to them, and the time so employed was taken from his business as a member of that firm. He does not admit the correctness of complainant's exhibit, but files a full statement and full account of the matters contained in said bill. Avers a full communication of his knowledge in relation to property, his willingness at all times to furnish full statements to complainant, and offers to refer the whole matter to arbitration.

To this answer complainant filed a replication.

Willis H. Johnson filed his sworn answer to the bill, in which he admits the formation of the partnership at the time stated in the bill; the correctness of the copy of the articles of partnership—that it is the only one ever executed by the partners, and contains the true terms thereof—the expectation of the patent; that when issued the right should belong equally to the firm, and the issuing of the patent; that Moffett, in his presence, informed Lewis that he had kept his son, Thomas Moffett, in Springfield, though without his knowledge or that of respondent, for the purpose of employing him as an agent to sell rights for churn and pump; that Lewis was about to visit St. Louis on the business of the firm of Lewis & Adams, about the time when the patent was received; that by the request of the respondent and complainant, Lewis deferred his starting until a churn could be prepared for him; that the said Lewis was requested to delay his journey until he could procure one of the churns, that he

could comply with the request of this respondent, and act for the firm in selling patent rights for the same in St. Louis; that Lewis did wait until the churn was made, and did go to St. Louis, where he remained about four weeks, selling said patent rights for the firm as aforesaid; that after said Lewis had been at St. Louis about two weeks, he informed this respondent and complainant of his progress up to that time, and that he intended to come home immediately; whereupon this respondent wrote to him, urging him to stay there as long as he could make sales, and he believes the said complainant did the same; that in compliance with the said request, the said Lewis did remain longer and made large sales, of the amount he knows nothing of his own knowledge, but refers to and adopts Lewis' answer in relation thereto; that there was no express agreement before or at the time of Lewis' visit to St. Louis, as to the capacity in which he was to sell these rights—whether as partner or agent—but respondent believes, from the nature of the contract between the parties, and the understanding of the partners, that Lewis was to devote no part of his time to the business of the firm of Lewis, Johnson & Co. Avers that said Lewis is entitled to commissions, as he claims in his answer, and, on his part, he has no objection to make thereto. Is satisfied with the manner in which Lewis sold.

At August term, 1849, of the Sangamon Circuit Court, Davis, Judge, entered a decree, allowing Lewis one thousand dollars, as a reasonable compensation for his services in making sales of said patent right, and directing a division of the residue among the partners equally.

From this decree Lewis appealed, assigning for error, the rendering of said decree in favor of Moffett.

S. T. LOGAN and STUART & EDWARDS, for appellant.

LINCOLN & HERNDON and J. C. CONKLING, for appellee.

Opinion by Mr. Justice CATON:

It is undoubtedly a general rule that one partner cannot charge the other partners or the firm for services rendered in the business of the copartnership, unless there is an express agreement to that effect; or where such agreement may be im-

plied from the course of business between the copartners, or from the nature of the services rendered in connection with the duties and obligations imposed by the copartnership articles upon the several members of the firm. This general rule, that one partner cannot charge the firm for extraordinary services, results from the fact, " that there is an implied obligation in every partner to exercise due diligence and skill, and to devote his services and labors for the promotion of the common benefit of the concern." Story on Part., sec. 182. When this reason fails, the rule itself must be relaxed. When it is impossible to determine how far the skill and experience of each, which was to be applied to the business of the firm, induced the terms upon which the copartnership was formed, it would be manifestly unjust for the Courts to undertake to inquire which had rendered the most services to the concern.

In this case, the duties imposed upon Lewis towards the firm, as respects his personal services, do not depend upon an inference of law, but are regulated by the express agreement of the parties, in the copartnership articles, as follows : " The said Lewis agrees, in lieu of his services, to furnish the foundry and machine shop, now occupied by Lewis & Johnson, free of rent, and purchase stock for the concern in St. Louis, when there, free of charge to the firm." Here, then, the appellant, for a sufficient equivalent, was absolved from that obligation which the law would otherwise impose upon him, " to devote his services and labors for the promotion of the common benefit of the concern." This duty, thus imposed by the law upon partners generally, is the reason assigned why a partner cannot charge the firm for services rendered.

In this case, it is true there was no express contract that Lewis should be paid for the services which he should render in the sale of the patent right; but when he was expressly requested and employed to render those services, which he was under no more obligation to render than a stranger, and when he has devoted his time and talent to the business of the firm upon such request, it is but reasonable and just that he should be paid for such services. His time and talent were as much his own as was his capital, and as much entitled to be taken into the account in the formation of the copartnership. This was done in the arrangement made, and the former were reserved to his own use. Sup-

pose, by the partnership articles, he had been exempted from paying any portion of the rent of the foundry and machine shop, in consideration of personal services which he had agreed to render, and that afterwards, at the request of the other members of the firm, he had paid the rent, would any one contend that he was not entitled to be reimbursed? Take this very case—and we have but to reverse the proposition—suppose Johnson and Moffett had paid the rent of these buildings, which Lewis had agreed to furnish free of rent, their claim to have that taken into the account in a final settlement would be denied by no one. If they might claim to be indemnified for the payment of rent, which by their agreement they were exempted from paying, why may not Lewis be paid for rendering services which, by the agreement, he was expressly exempted from rendering? In no case that we are aware of, where it has been held that, in the absence of an express agreement, one partner should not recover for rendering more services than the other members of the firm, was he exempted by the partnership agreement from rendering those very services for which he had charged the firm; and that is the reason assigned by Judge Story why such claim should be disallowed. Story on Part., sec. 182. But there is no inflexible rule of law that one partner shall not recover for extraordinary and unusual services, without an express agreement that he shall be paid for such services. The case of Bradford *vs.* Kimberly, 1 Johns. Ch. R., 431, shows that where certain members of a firm are employed to render services, which the law, or the agreement of the parties, does not impose upon them as partners, there the law implies an agreement that they shall be paid. After stating the general rule, the chancellor in that case proceeds: "But where the several owners meet and constitute one of the concern an agent to do the whole business, a compensation is necessarily and equitably implied in such special agreement, and they are to be considered as dealing with a stranger."

It is true, as was insisted on the argument, that the statement in the answer of Lewis, that he sold the patent rights as agent of the firm and not as partner, is not conclusive as to the character in which he acted; but that character must be determined from the facts established. That he rendered the services at the request of the other members of the firm, is abundantly established. As

he was on the point of starting to St. Louis on other business, the patent for the churn arrived from the patent office. One of the active members of the firm requested him to postpone his departure until a churn could be manufactured, and to take it with him to St. Louis and sell the rights. Upon such request he did postpone his departure for several days, until the churn was completed, which he took with him to St. Louis, and made the sales. All the circumstances of the case show that the other partner acquiesced in and approved of this employment, even if that were necessary. Here, then, was an express agreement to employ Lewis to render services which he was under no more obligation to perform than a stranger; and the law must imply an agreement to render him a reasonable compensation therefor.

To what compensation is the appellant reasonably and justly entitled? The evidence on this point is very voluminous, but it is unnecessary to state and review it all minutely. The nature and character of the services rendered, the time employed, and the results accomplished, admit of no dispute. The balance of the testimony is principally made up of the opinions of witnesses as to the value of the services rendered, and of the commissions usually allowed in the sales of patent rights. Of this last branch of the evidence, it may be here remarked, that while it may be entitled to be considered, upon the question of the amount of compensation to be allowed, it by no means establishes such an usage as to be binding upon the parties, as an implied contract. In order to give a usage that effect, it must have become so universal and notorious as to raise a reasonable inference that the parties acted in reference to it, and with the expectation of being governed by it, without a particular allusion to it. That a majority of patent rights are hawked about the country by trading agents who receive a commission upon the amount of their sales, may be true; yet this is by no means universally the case. Nor are the commissions allowed these itinerant agents, by any means uniform; frequently varying, as it appears, from one-fourth to one-half of the amount of sales effected. Nor with any degree of propriety or justice could they be uniform, unless all patent rights were equally valuable, or at least equally saleable.

While the opinions of witnesses, who have been extensively engaged in the sale of patent rights, as to the value of these services, may not be absolutely binding upon the Court, yet they

are certainly entitled to serious consideration. But after all, we must look to the nature and character of the services rendered, the time employed, the skill and talent exercised, and the benefits derived to the firm, and then, by exercising our own judgments, in connection with the judgments of others, where, as in this case, their opinions are not necessarily conclusive, we must come to the most satisfactory conclusion at which we can arrive.

The appellant went to St. Louis with this churn, and in the course of a few weeks sold out the entire right to various individuals, for the nominal aggregate sum of $ 52,000, and for which the firm actually realized the sum of $ 38,000. Now, the time actually employed was very inconsiderable, but the results were truly wonderful, when we consider the sales were made upon an actual exhibition of the churn, when the testimony shows, and all now seem to admit, that the invention is really valueless. Yet it is but justice to say, that we do not believe that this fact was known to any of the parties at that time. There must have been a certain speciousness about the churn, which deceived Lewis, as well as his victims, as to its real value. Whatever plausibility there was about this invention, which commended it to the favorable notice of purchasers, ought to inure to the benefit of the owners of the patent, while Lewis may be entitled to the merit of whatever skill he displayed in presenting these commendable appearances to the view of purchasers, and the judgment with which he made his contracts. His success ought to satisfy any reasonable ambition in that way. Although he may not be entitled to the merit or demerit of having imposed, by the force of his genius alone, upon the purchasers, so as to have realized that large sum from the sales of an invention, which, in the hands of another, would have produced little or nothing, yet that his services were very meritorious, to the firm, at least, cannot be disputed, and the other members ought not to object to paying him a proportionate compensation, and one which ought abundantly to satisfy him for the time and labor bestowed. Were we to be governed by the opinions of a majority of those witnesses who have expressed opinions, as to the amount of compensation to which the appellant is entitled, we might have to allow even the full extent of his present claim, yet we cannot shut our eyes to the fact, that most of those wit-

51

nesses arrive at their conclusions by assimilating this to other patent rights; which, while they may have been, intrinsically, more valuable, yet were undoubtedly less saleable. To allow the claim of $12,000, now set up by Lewis, we think would be extravagant; and it is manifest, from his own conduct, that he did not originally consider himself entitled to that amount. We may reasonably suppose that he designed to retain in his own hands, independent of the wares left with Lewis & Adams for sale, enough, over and above his proportion as partner, to compensate him sufficiently for his services. By having paid over the balance to the other members of the firm, he indicated a limit, beyond which he did not expect to claim for his commissions. His whole conduct shows that he would not be likely to pay over to his partners more than what he considered their just proportion of the proceeds of these sales. By allowing him what he did retain, we give him no stinted compensation; but as we think the evidence abundantly warrants this, we have determined, for the want of a more satisfactory criterion, to adopt that as the measure of his compensation. To this, at least, Johnson in his answer does not object. As the decree which Moffett obtained against Lewis for $1,377 41, was for his proportion of these sales, which had been retained by Lewis, over and above the compensation allowed him by the Circuit Court, it follows that that portion of the decree must be reversed, and the balance of the decree must stand affirmed. The costs of this Court must be equally divided among the parties.

*Decree reversed.*