EMERSON, Appellant, vs. DURAND, Executor, etc., and others, Respondents.

*May 7 — October 13, 1885.*

*Partnership: Compensation of partner for services; Implied agreement.*

A partner may claim compensation for his services in connection with the partnership business if an agreement to that effect is fairly implied from the course of dealing between the partners or from circumstances of equivalent force. Upon the evidence in this case it is *held* (ORTON, J., dissenting) that there was such an implied agreement.

APPEAL from the Circuit Court for *Racine* County.

Action for an accounting and settlement of a business carried on under the name of Emerson & Co., to which, it is alleged in the complaint, the defendant *Henry S. Durand*, as executor of the will of Caroline B. Durand, deceased, and trustee of her estate to hold and manage it for

his daughters, the other defendants, had contributed the sum of $10,250. The defendant *Henry S. Durand* claims to have been, *individually*, an equal partner with the plaintiff in the business, and that his daughters, the other defendants, have no legal interest whatever in the proceeds or assets of the firm.

The business was carried on from about May 1, 1872, until August 28, 1882. It is alleged in the complaint that during that time neither of the defendants ever performed any service whatever in connection with the business, but left the entire labor in connection therewith to this plaintiff and persons employed by him; that the plaintiff's personal labor in and about said business has been reasonably worth the sum of $2,500 per year to the firm, over and above the value of his name and credit to the business; and that it was understood from the circumstances of the parties, etc., that the plaintiff was to be paid a reasonable compensation for his services. The answer of the defendant *Henry S. Durand* denies that there was ever any understanding that the plaintiff was to receive any other reward than his share of the profits of the business; and alleges that the pecuniary aid, advice, efforts, credit, and services of said defendant in the business have been of greater value than the labor and services performed by the plaintiff.

The view taken by this court of the evidence given on the trial will sufficiently appear from the opinion.

The circuit court found as facts, among other things, that about May 1, 1872, the plaintiff and the defendant *Henry S. Durand*, in his individual capacity, entered into a copartnership for the purpose of manufacturing linseed oil in the city of Racine, under the name and style of Emerson & Co., and it was then agreed that each of said parties should contribute $10,000 to the capital stock of the firm; that each of said parties did contribute the sum of $10,250; that the defendant *Henry S. Durand* from the formation of said

firm until its dissolution aided in the conduct and management of the business thereof by his counsel and advice, and, whenever called upon by the plaintiff, performed sundry and divers services for the firm in Chicago and elsewhere; that the plaintiff during the continuance of the partnership gave his personal attention to the management of the details of the business and has engaged in no other pursuit, and that the books of the firm were kept under his supervision; that at some time during the continuance of the partnership the plaintiff advanced for the use of the firm the sum of $2,165.75 over and above the $10,250 paid in as aforesaid; that such advance was made without the knowledge of the defendant *Henry S. Durand*, and that his attention was not called to the fact until about January 1, 1882; that the firm was dissolved by mutual consent August 28, 1882; that there never was any agreement between the members of the firm that either of them was to have or receive any compensation or reward aside from an equal interest in the profits of the business; that the estate of Caroline B. Durand never had any financial interest in said firm business; that the defendants *Frances E. Durand*, *Alida L. Durand*, and *Helene S. Durand* were all minors when said partnership was formed, and that they never sustained the relation of partners to the plaintiff and have no legal interest in this controversy.

As conclusions of law the circuit court found, *inter alia*, that the parties were entitled to an accounting; that the plaintiff was not entitled to any allowance by way of salary or compensation of any kind, aside from the profits of the business; that the profits of the business must be equally divided between the plaintiff and the defendant *Henry S. Durand;* and that the plaintiff is entitled to interest at seven per cent. on any excess of funds put into the business by him over and above $10,250, for the length of time it actually remained in the business.

An interlocutory decree was entered accordingly and the cause was referred to a referee to take and state the account in conformity to the findings and conclusions. The report of the referee was confirmed, and final judgment was entered accordingly. The plaintiff appeals.

For the appellant there were briefs by *Fish & Dodge*, and oral argument by *Mr. Fish*.

For the respondent there was a brief by *Quarles & Winslow*, attorneys, and *J. V. Quarles*, of counsel, and the cause was argued orally by *Mr. J. V. Quarles*. To the point that the plaintiff, having done just what he was expected to do when the partnership was formed, and no more, and having never found fault because he did it or asked for compensation until after the fact, is not entitled to any compensation for his services, they cited 2 Lindley on Part. 774, 775; 1 Collyer on Part. (6th ed.), 507, note; *Hutcheson v. Smith*, 5 Irish Eq. 123; *Caldwell v. Leiber*, 7 Paige, 493; *Lee v. Lashbrooke*, 8 Dana, 214; *Curliffe v. Dyerville Co.* 7 R. I. 325; *Piper v. Smith*, 1 Head, 93; *Murray v. Johnson*, id. 353; *Beatty v. Wray*, 19 Pa. St. 516; *Heath v. Waters*, 40 Mich. 465; *Robinson v. Anderson*, 20 Beav. 98.

The following opinion was filed June 24, 1885:

COLE, C. J. The facts of this case seem more consistent with the hypothesis that the plaintiff and defendant *Henry S. Durand* were partners *inter sese* in carrying on the business of manufacturing linseed oil at Racine than any other. The real relation of the parties has to be gathered by inference from their acts and the manner the business was conducted. There was no contract, either written or parol, clearly proven, to which reference can be had to ascertain their rights and liabilities. The plaintiff and *Mr. Durand* differ widely as to what was said and understood by them when they engaged in the enterprise, and there is no stronger reason for attaching credit to the statements of

one than the other. As far as we can judge, they are of equal intelligence and credibility; and, where their statements are in conflict, they neutralize each other, except where sustained by other independent testimony. The plaintiff says that he did not understand he was entering into a general partnership with *Mr. Durand* to carry on this business, and he repudiates the idea that *Durand* was ever his partner. He states that he supposed *Mr. Durand*, as the result of their negotiations, was to contribute from the trust funds in his hands, belonging to his daughters, $10,000; that this sum was to receive its proportionate share of the profits earned by the capital stock employed in the business, after the expense in carrying it on had been deducted. But he did not understand that *Mr. Durand* expected to be, or was in fact, personally interested as a partner in the business. His idea of his relation to the parties, and the responsibility he assumed under the contract, may be gathered from the following extracts from his testimony:

He says: "I never considered there was an agreement to form a partnership with *Mr. Durand*. I didn't consider there was any partnership formed, unless the partnership was a special partnership with his daughters, as he told me. I didn't understand the amount put in to be a loan. *Mr. Durand* had some money that belonged to other parties. I understood him that it was not his. He told me it was not; that it belonged to his daughters; and that he would put it into the business. He put it in in the name of his children, in trust. My construction of our relation was that this money belonged to the children, and they held the relation to me of special partners. I had no idea of forming a partnership personally with *Mr. Durand*." Folios 155, 156. In another place he says: "The paper that I considered myself liable for, with the exception of the $20,000 in as capital, was $35,000 to *Durand* as trustee, and the rest

at the bank. It all amounted to $95,000 at one time. I thought I was solely liable on the $35,000 loaned by *Durand,* trustee, except the capital of $10,250 put in. I thought the girls were liable to the amount put in, and nothing more. I considered them special or limited partners. I knew of no way to get anything out of them. I understood from the law that the estate was not liable beyond the amount invested. I know a partner is liable to the amount of his means; but when they were infants I don't suppose they were liable, because they could not give their consent." Folio 196.

These extracts show the plaintiff's understanding of the matter. But the difficulty about this arrangement is that *Mr. Durand's* daughters were minors, incapable of making a binding contract of partnership, whether general or limited. Besides, it does not appear that either of them ever attempted to make such a contract, or was ever consulted about engaging in this business. And now they deny in their answer any partnership, and disclaim any interest in the assets or profits of the concern. It may well be that the plaintiff assumed a peculiar responsibility in respect to the trust funds — if any there were — which were invested in the enterprise. Suppose the business had been unsuccessful and the entire capital lost, would not the plaintiff have been liable to the *cestuis que trust* for the amount of their funds put into it, even though he and *Mr. Durand* had actually been partners? We are inclined to think he would have been liable under the rule of law that where a trustee, in violation of his duty, invests trust funds in a business, the responsible party interested in that business, who knows the character of the funds, is liable to the *cestui que trust* for it. This unusual responsibility which plaintiff incurred in consequence of the investment of trust funds in the enterprise, with his knowledge, may be a circumstance to be taken into account when the question whether he should

be allowed any compensation for his services in the management of the business is considered. It was doubtless a larger measure of liability than a partner ordinarily assumes in respect to the capital stock invested. But still we cannot see that that fact has any tendency to disprove the claim that a partnership was formed between the plaintiff and *Mr. Durand.* And *Mr. Durand* testifies that such a partnership was entered into, and his statements on this point are corroborated by many facts and the general course of dealing. We therefore feel warranted in assuming that these parties were partners in this business, and equally interested in the concern.

Such being the case, the important question arises whether, upon all the facts which are well established by the evidence, the plaintiff can be allowed any compensation for his services in managing the business. On this point it is not claimed that there was any express agreement that he should be paid for his services, but it is said under the peculiar circumstances the court will imply such an agreement. It is frankly admitted by the learned counsel for the plaintiff, that, as a general rule, one partner cannot charge the other partner for services rendered in the business of copartnership unless there is an express agreement to that effect, or where such an agreement may be implied from the course of business between the partners, or from the nature of the services performed being such as are not usual for one partner to render without receiving a compensation therefor. The authorities cited state the law substantially in that language. And the reason given for the rule is that "there is an implied obligation in every partner to exercise due diligence and skill, and to devote his services and labors for the promotion of the common benefit of the concern." Story, Partn. § 182. "Each partner, in taking care of the joint property, is, in fact, taking care of his own interest, and is performing his own duties and obliga-

tions implied in, and constituting a part of, the consideration for the others to engage in the partnership; and the law never undertakes to measure and settle between the partners the relative value of their various and unequal services bestowed on the joint business." *Ibid.*

This is the ordinary statement of the rule of law upon this subject. But still the rule that each partner must be assumed to render his services in the partnership business gratuitously, is not inflexible or of universal application. It has its exceptions, founded in wisdom and experience. Where it can be fairly and justly implied from the course of dealing between the partners, or from circumstances of equivalent force, that one partner is to be compensated for his services, his claim will be sustained. This principle is fully recognized in the following cases: *Bradford v. Kimberly*, 3 Johns. Ch. 431; *Caldwell v. Leiber*, 7 Paige, 483; *Lewis v. Moffett*, 11 Ill. 392; *Levi v. Karrick*, 13 Iowa, 344; *Godfrey v. White*, 43 Mich. 171; *Cramer v. Bachmann*, 68 Mo. 310; and *Sheridan v. Healy*, 15 Chi. Leg. N. 104. So, where a partner fails to perform his agreement to render services to the firm, he may be charged on the settlement of the firm accounts with the value of the services which he agreed to give and refused to render. *Marsh's Appeal*, 69 Pa. St. 30.

This case differs in many important particulars from ordinary partnerships. The question is, Can an agreement to pay the plaintiff what his services were reasonably worth for the management of the business be fairly implied from the circumstances of the case and the acts of the parties? "The intention of the parties to any particular transaction may be gathered from their acts and deeds, in connection with surrounding circumstances, as well as from their words; and the law, therefore, implies, from the silent language of men's conduct and actions, contracts and promises as forcible and binding as those that are made by express words,

or through the medium of written memorials not under seal." Add. Cont. 201; *Tyler v. Burrington*, 39 Wis. 376. In this case, as in many others, there may exist facts and circumstances so clear and unequivocal in their tendency as to be equivalent to direct and positive proof of an express contract to pay for services performed. We shall only allude to a few of the leading facts which tend in that direction. We have referred already to the fact that trust funds were invested in the enterprise,— for this is a legitimate inference from the evidence,— and that the plaintiff would doubtless have been liable to make good these funds to the *cestuis que trust* in case the capital had been lost. So, too, the *cestuis que trust* had the right as against both partners, on the facts disclosed, to claim their share of the profits arising from the use of their money in the partnership business. Besides, in our estimation, the evidence clearly and satisfactorily shows that the plaintiff had the entire control and management of the business, in all its branches and details, from the very inception of the adventure for about ten years. He gave his entire time and attention to it. He superintended the construction of the mill, purchased machinery for it, and superintended the making of the additions and improvements. It is true, he consulted *Mr. Durand* on these matters, and the latter made some suggestions as to the work, and occasionally visited the mill while it was being built and improved. But that the plaintiff had the entire charge and responsibility of the erection of the mill and improvements is a fact so clearly established as not to admit of doubt in our minds. The labor and care of operating the mill was performed and rested with the plaintiff and those employed by him. He hired the men and paid them; attended to the matter of procuring flax-seed and other stock; looked after the process of manufacturing it into oil, and to the selling of the manufactured products. He looked after the finances. Says Mr. Northrop,

the cashier of the Manufacturers' National Bank, the institution with which the principal banking business was done: "The banking business of Emerson & Co. was transacted by *Thomas J. Emerson* and William T. Emerson in respect to deposits, drawing checks, and borrowing money, except so far as *Durand* gave his notes." The plaintiff thus had the charge of the business in all its branches and details, gave his entire time and labor to its management, while *Mr. Durand*, from the nature of his engagements, could not, and in fact did not, give scarcely a day or the least attention to it; for during all this period *Mr. Durand* was employed by the year by the Home Insurance Company, of New York, on a salary of $10,000, and, as he says, was "subject to call during all that time, as the exigencies of their service should require." He had an office in Chicago, where he spent the greater portion of his time attending to his insurance business. He came home usually Saturdays, when he sometimes saw the plaintiff and visited the mill. But the business of the mill was not to interfere with his engagement to the insurance company, and it is very plain it did not. His services and time were faithfully given to the company that employed him. He did not, either as an individual or as trustee, put as much capital into the concern as did the plaintiff. Nor did he, either as trustee or personally, raise as much money for working capital as did the plaintiff on his individual credit.

When these facts, and others of a like tendency, are considered, they afford, to our minds, sufficient ground for implying a contract to compensate the plaintiff for his services in the management of the business. It is unreasonable to suppose the parties intended or understood that the plaintiff would give his entire time, attention, skill, and ability to the promotion of the common enterprise, while *Mr. Durand*, working for an insurance company on a large salary, should really contribute neither time nor attention nor

labor, and that both should stand upon the same ground as to profits, and the plaintiff be paid nothing for his services. But, without dwelling longer upon the evidence bearing upon this point, we conclude by saying that a contract to pay for services rendered may be as fairly and incontrovertibly established by the acts and conduct of the parties, in connection with surrounding circumstances, as by words. Such a contract, we think, may reasonably be implied in this case.

The learned counsel for the defendants, in his brief, indulges in some remarks as to the ability, sagacity, large business experience, and unlimited financial resources of *Mr. Durand*, which he claims were of great aid to this manufacturing enterprise. It is not necessary, nor would it be according to the truth, to deny that *Mr. Durand* is an able and sagacious business man,—one of experience, and of good credit in the mercantile world. The fact that he is employed by one of the leading insurance companies of the country on a salary of $10,000 is a sufficient guaranty of all this. But still, his skill, experience, and ability were not of that essential aid or advantage to the partnership business as counsel claims, because they were not devoted to promote the benefit of that concern. He was wholly employed about other matters in which his ability and skill were exercised. The evidence in this case is perfectly conclusive that the success of this profitable concern was not owing to *Mr. Durand's* efforts, credit, or energy, but it was largely, if not wholly, due to the prudent management, careful attention, excellent judgment, and untiring devotion of the plaintiff, who had charge of it. He was, as the proof shows, a gentleman of high character and excellent credit; or, in the language of one of the witnesses produced on the part of the defendants, "he was supposed to be a careful, prosperous man, who had been careful and gathered up money for years." It is impossible

to deny that he possessed in an eminent degree the confidence of bankers and financial men. Judging from what appears in this record, he is every way the equal of *Mr. Durand* in financial resources and business capacity. To any and all disparaging remarks made as to his capacity as a financier, or his qualifications as a business man, the plaintiff need only point to the result of ten years' management of this manufacturing business for complete vindication. He commenced operating the mill some time in 1872, and had, as we have said, the exclusive charge of the business for ten years. During that period he made large gains, so that, after the payment of all debts and the capital originally contributed, there remains to each partner as net profits an amount nearly double the capital he invested. This money was made when — as it will be remembered by all — the country was suffering from one of the severest commercial crises it has ever passed through,— a period of several years when general distrust and loss of credit, corporate and individual, everywhere prevailed; when business enterprises of every kind and on every hand, owing to the depression in trade and financial embarrassments, were wrecked and ruined.

As the plaintiff and *Mr. Durand* were equal partners, the profits should be divided equally between them. The plaintiff contributed $2,165.75 more capital than *Mr. Durand.* We think this should be treated as a loan to the firm, not as capital stock. The plaintiff is entitled to receive this amount, with interest thereon, for the time the firm had the use of it. The plaintiff must also be credited with the value of his services in managing the business what they were reasonably worth. The court can ascertain such value by taking further testimony on the question if deemed necessary, and it is desired by the parties. The account can then be stated on a proper basis, and the assets divided as above indicated.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for further proceedings in accordance with this opinion.

ORTON, J.   I am unable to coincide in the decision of this case in respect to the allowance of an annual compensation to *Thomas J. Emerson,* as the copartner of *Henry S. Durand* in the firm of Emerson & Co., for his personal services in the business of the concern.

That it is an invariable rule of partnership law that one partner cannot charge the concern for his personal services in the business, unless there was an express agreement between the partners to that effect, or unless the facts and circumstances were such that the law will imply such an agreement, is not disputed by any one.   It is not a question of equity or *quantum meruit,* but solely of contract, either express or implied; nor is it a question of *comparative* services rendered by the several partners.   Such a contract cannot be implied by balancing their services and by finding that one partner has rendered proportionally more service to the business or performed more labor than his copartners; for by such a rule such a contract might be implied in all cases, and the rule would be destroyed.   There must be something peculiar in the nature or conditions of the business, or in the relative situation of the partners; something permanent and inherent, and not occasional or incidental, by which the law would imply that such was the understanding of all the partners.   Any other rule or criterion would be too shifting and uncertain to be reliable.

There was never any express agreement on the subject. What, then, were the facts from which such an agreement is claimed to have been implied?   The following facts are established by the testimony, mainly of *Emerson* himself: In 1872 *Emerson* was out of employment and desired to go into business, and consulted his old friend and neighbor,

*Durand*, about going into the business of the manufacture of linseed oil, which he had learned was very profitable, and obtained his advice about it, and requested him to go into partnership with him in that business. Neither party had any personal experience in the business. *Durand* consented to go into the business with *Emerson* if he would take a personal supervision of it, as he was employed in other business and could not give it constant attention. *Durand* had control of a large amount of trust moneys, and it was agreed that an oil-mill should at once be built, and that each party should put in $10,000, which they did. This was in March, 1872. *Durand* was a man of great business experience, and of wide business acquaintance. The mill was built and the business started by the equal and joint contributions of each, and the real estate was held in the name of the firm, and the judgment of *Durand* was greatly relied upon in planning and laying the foundations of the business. Thus the plant was made. Afterwards the stock contributions were increased to $20,000 each. Thereafter *Emerson* had principal charge of the business, but from time to time frequently consulted and advised with *Durand* about it. According to the testimony of *Emerson, Durand* was very seldom consulted, and knew scarcely anything about the business, or the manner in which it was conducted, and yet he testified that *Durand* was a very careful and excellent business man. It would indeed be strange if such a man should invest in such an enterprise $20,000 of trust funds belonging to others, for which he was personally liable, and afterwards loan the concern more of such funds, and borrow for the concern other large amounts, and not concern himself about its conduct, and take scarcely any interest in it. *Durand* lived in Racine, and was a near neighbor and friend, besides being a partner, of *Emerson*, and was at home, idle, at least two days in the week, and it is most reasonable to suppose that he was often consulted

about the business, and that much of its success depended upon his superior judgment and experience. On this question as to the amount of the beneficial services of *Durand* in the business from week to week and year to year during the whole time, the testimony of *Emerson* and *Durand* is widely apart; *Emerson* claiming that he rendered scarcely any service, and *Durand* claiming that his services were great and indispensable, and that when not at home attending personally to its concerns he made use of his wide acquaintance throughout the country, and his high standing and influence, in establishing the credit of the concern, and in securing the best markets for its products, and the best chances for purchasing seed and supplies. *Emerson* was an old man, and was not expected to do and did not do much manual labor, and only supervised the business and gave it his constant attention. Employees and clerks, to a very liberal number, rendered any manual labor of *Emerson* unnecessary in any part of the business. He had only to be accessible and give the necessary instructions. His son William, quite a young man, was employed at a salary of from $800 to $1,000 per year, and a younger son, Charles, physically disabled, was employed at about the same rate, without consulting *Durand* about it. In the course of the business, a large amount of money had to be borrowed, and *Durand* raised on his own paper from time to time $145,000, as admitted by *Emerson*, and claimed to be much more by *Durand*, and *Emerson* raised as much or more on his own paper, and *Durand* left in the concern all of his share of the profits.

There is, certainly, nothing in all this that would raise a contract by implication between them that *Emerson* should be paid for his services $2,500 per year, or any other sum. In all this, nothing is shown that is at all peculiar to this partnership except the great liberality and wonderful confidence of *Durand* towards and in his partner, *Emerson*, in

the management and control of interests of such magnitude. But there is something more in the evidence in this case which makes this pretended claim of *Emerson* groundless, if not fraudulent, and that is, its *concealment* from *Durand* until about the final close of the business in 1881. There was a set of books kept, in which all the proper entries of the business were supposed to be made, and proper balances ought to have appeared. But two most important items seem to have been studiously and intentionally left out, and never appeared upon any of the books to which *Durand* had access. One was the salary of the boy, Charles, the son of *Emerson*, at $1,000 per year, which was left unpaid from year to year, and finally entered up near the close of the business at compound interest. When informed of this in 1881, for the first time, *Durand* of course objected to it, especially the interest, but does not contest it in this court. During all the time from 1872 until in the year 1881, nothing had ever been even intimated to *Durand* that *Emerson* intended to charge a salary for his own personal services, and no entry, charge, or memorandum thereof had ever appeared upon the books allowed to be seen by *Durand*. The business had been very profitable, and a large amount was to be divided between the parties, as finally ascertained upon closing up the business, and it is not unnatural that *Emerson*, through an avarice which increases with its gratification, should have desired to retain in his hands as large a proportion of such profits as possible, as the lion's share. For the first time, in 1881, when about to close up the business, *Emerson* informed *Durand* that he claimed an annual compensation of $2,500 for his services, and interest thereon compounded from year to year. As soon as so informed, *Durand* denied the claim, and insisted that he had no lawful right to any compensation whatever for his services.

In the first place, *Emerson* urgently requested *Durand* to become his partner; and probably for the reason that

*Durand* had long been his friend and neighbor, and was a man of great business sagacity and experience, of high standing, and very wide acquaintance throughout the country. Why did not *Emerson* commence this business alone, or seek some other partner who could render more service in the business, and had better credit, and who was solvent? for he now testifies that *Durand* rendered scarcely any service, and could not do so on account of his other engagements, and had no credit or property. All this he knew as well when he sought him for a partner. He must have considered it an object and an advantage to the enterprise to have *Durand* connected with it; and to induce him to become his partner he stated that he wanted something to do, and that he would superintend the business, and it was on this understanding that *Durand* consented to embark in the enterprise on equal terms, and probably never dreamed that *Emerson* intended to charge the concern a salary; or at least nothing was said about it, and there was no such contract. *Emerson* had the full control of everything, and could employ all the labor or service the business required, and did employ his two sons at enormous salaries to assist him in the business nearly the whole time. Did *Emerson* intend at the start to charge the firm for his services, or did he then understand that he was to be paid for his services, or did he suppose that *Durand* so understood? It would seem that he did not. There are only two theories about it. He either did not so intend, understand, or suppose, and this claim at the close of the business was an *after-thought*, or he did at the start intend to make this charge and keep it concealed from *Durand* until the close of the business, and until it was too late for him to object to it, and then seek to sustain it in the manner he has.

On the first theory there is not even the pretext of any such claim, and on the second the claim is fraudulent. If he had paid himself or charged the concern with his first

year's salary, on the books, or made an entry of it in some way, then *Durand* would have had a chance to interpose objection to it, or he could have expressly or tacitly assented to it.   Why did he not make an entry of this charge on the books at the end of the first year, when his salary was due, as he now claims?   Was it mere neglect, or did he fear that *Durand* would object to it, and leave the concern, or, if the law was not sufficient protection, insist upon a written agreement that *Emerson* should not be paid for his services, and have the matter then settled beyond question?   But no! the matter was kept a profound secret from *Durand* for nearly ten years, and then, to his utter astonishment, the charge is sprung upon him in the final settlement.   Is there anything fair or honest about this?   Is there any evidence in such a transaction that there was an implied agreement on the part of *Durand* that *Emerson* should be so paid for his services?   It would seem that a matter of so much consequence as $2,500 per year salary to one of the partners, and in the aggregate $25,000, and, if it was allowed to stand as an annual charge against the firm, with interest compounded, an amount which would consume nearly, if not quite, all of the profits coming to *Durand* from the business and the use of his capital, should have been made the subject of a special and express agreement at the time of the formation of the partnership, rather than be left to the uncertain chances of an agreement to be implied from the facts and circumstances about which the parties themselves so widely disagree in their testimony.   This would make a very bold exception to the general rule of law, established in reason and justice, that one partner, to the exclusion of the other, should be allowed nothing for his personal services in the business.

If *Emerson* is entitled to such a salary, and he left it in the business as a debt of the firm to himself, why should he not have compound interest, if the claim is honest and just,

as he insists that it is? *Emerson* so treated the salary of his son Charles, which was so left in the concern to his credit from year to year; why is he not equally entitled to interest on his salary? Both are rated as *salaries*, or annual compensation; and, if so, they are due and owing from year to year. Of course, this court does not sanction this matter of interest, and why not? The interest is just as valid a claim as the principal, on the theory of *Emerson*.

But if the question of *Emerson's* compensation for his services is not to be determined upon the principle of an implied contract,— and we have shown that there are no facts and circumstances from which any such contract could possibly be implied,— then it must have been determined upon a mere comparison of the services actually rendered by each partner for the benefit of the concern. According to the testimony of *Emerson*, his services were the most valuable; but according to the testimony of *Durand*, he rendered services which, although of a different kind, were at least equally valuable. This question cannot be determined in favor of *Emerson* without *discrediting* the testimony of *Durand;* and by what principle can this be done by this court in opposition to the finding of the circuit court. It would be a mere arbitrary opinion at best. The assertion of a principle which, if not unsupported by law, at least forms a most glaring exception to a general rule of law, ought to be supported by clear and unquestionable evidence. It is impossible, from the evidence in this case, for any court to determine that *Durand's* services were not as beneficial to the business of the concern as those of *Emerson*. A mere *notion* that one partner has done more than another, from a mere cursory view of their comparative services, which could as well be conceived in relation to all partnerships, will not answer. It would be difficult to find a partnership, doing any similar kind of business, in which the services of all the partners are equal in extent or value. A

precedent should not be established which will encourage some partner in almost any firm, at the close of the business, to go into court for the purpose of establishing his claim for superior services rendered in the course of its business. I cannot but think that such a claim — in this case, of all others — has the least merit in law or equity. There was no contract to such effect, either express or implied, and there is no reliable evidence of any superiority of services.

I regret that this dissenting opinion is so long. · But the case is very voluminous, was very ably contested, and is very important, both in the amount and principle involved.

Upon a motion for a rehearing, counsel for the respondent cited *Guyger's Appeal*, 62 Pa. St. 80; *Reybold v. Dodd*, 1 Harrington, 333; 26 Am. Dec. 401.

The motion was denied October 13, 1885.