[No. 31175. Department One. June 15, 1950.]

ALFRED WAAGEN, *Respondent*, v. KARL GERDE *et al.*, *Appellants.*[1]

[1]Reported in 219 P. (2d) 595.

*Jones, Birdseye & Grey* (formerly *Jones & Bronson*), for appellants.

*Levinson & Friedman,* for respondent.

DONWORTH, J.—This is a suit in which the plaintiff alleged that during a period of six years an equal partnership existed between him and the defendant Karl Gerde in the ownership and operation of a certain fishing vessel. Plaintiff prayed for an accounting of partnership earnings alleged to have been fraudulently withheld by the defendants in the amount of twenty thousand dollars. The defendants, by their answer, admitted that the parties had been copartners for a time, but denied that any partnership earnings had been withheld from the plaintiff. At the beginning of the

trial, defendants filed an amendment to their answer which interposed the defense of laches and unnecessary delay in asserting the rights claimed by the plaintiff. The reply put in issue the affirmative allegations of the answer.

Defendants demanded a jury trial and the plaintiff moved to strike the demand on the ground that the case was one of equitable cognizance. The motion was argued prior to trial and denied. Subsequently, when the case came on for hearing, the plaintiff renewed his motion to strike the defendants' demand for a jury and this motion was granted by the trial judge. The case was then tried to the court sitting without a jury. At the conclusion of the trial, the court took the case under advisement and wrote a memorandum decision holding in favor of the plaintiff. After having denied the defendants' motion for a new trial, the court granted plaintiff judgment for the sum of $11,916.44, from which the defendants have appealed.

The trial of the case consumed seven days during which eighty-eight exhibits were admitted in evidence. Forty-four of these exhibits consisted of letters written in Norwegian by appellant Karl Gerde to respondent (including eight letters written in English by Mrs. Gerde) relative to the ownership and operation of the fishing vessel named the "Princess." To attempt a comprehensive statement of all the activities of the parties relative to this fishing vessel between March, 1940 (when it was purchased), and March, 1946 (when it was sold), would extend this opinion beyond any reasonable length. We, therefore, confine ourselves to a statement of facts which are necessary to an understanding of the errors assigned by appellants.

Appellant Karl Gerde (who will be referred to as the appellant) and respondent were born in Norway and are first cousins. Each came to the United States in 1923. Respondent took up his residence in San Francisco. He has followed the sea since boyhood and now has a master's license. At various times during the period involved in this case, his health had been poor and he required medical care. Of this situation appellant was well aware and, in the discussion of their plans, told respondent that his state of health would

make no difference in their contemplated business relationship.

At the time the parties first discussed the purchase of a fishing vessel, appellant resided in Portland, Oregon. In August, 1941, he and his family moved to Seattle. He was an experienced fisherman and during the summer he was employed as net foreman by a salmon cannery in Alaska.

The general plan which the parties discussed in 1939, and again early in 1940, was to either build or buy a fishing vessel and fish along the Pacific coast for tuna, halibut and salmon. The possibility of shark fishing was also mentioned. It was contemplated that respondent would be in charge of the fishing operations during the summer (when appellant usually worked in Alaska) and appellant would be in charge in the winter.

Appellant located the "Princess" in March, 1940, and arranged to purchase her for $8,750 and to install a new engine for $700. He also obtained a loan of $5,000 from the R.F.C. which was secured by a mortgage on the boat. Respondent sent $2,500 to appellant for the purpose of their acquiring the boat and the purchase was consummated, appellant mortgaging his home to pay for his share.

In May, 1940, appellant wrote respondent asking for fifty dollars to help pay interest on the mortgage and an insurance premium. Respondent sent him one hundred dollars and thereafter no further request for money was ever made by appellant, although respondent was able and willing to contribute his share.

During the remainder of the year 1940 and most of 1941, the "Princess" made a number of fishing trips without any marked success. In October, 1940, respondent took the boat on a short fishing trip during which the boat developed engine trouble, and he sent for appellant, who came and took charge of the boat. In the spring of 1941, respondent brought the boat from San Pedro, California, to Seattle for repairs and worked painting the boat for about two weeks. That was the last time he served on the "Princess" as a member of the crew. In July, 1942, respondent wrote appellant about going out on the "Princess," but appellant (in spite of the

suggestion contained in his letter of December 1, 1941, quoted below) replied that a full crew had been hired for the season and he would write again when there was a vacancy. Respondent never heard anything further from appellant about working on the boat.

Appellant was in Alaska during each summer except 1942 and 1945 and obtained the services of another fisherman to take charge of the boat. Appellant and respondent did not see each other from March, 1941, to September, 1945.

Whenever appellant was in charge of the boat he received the customary portion of the two thirds of the "catch" to which the crew was entitled. This amounted to $19,755.09. In addition, appellant received $2,812.09 for services rendered as captain or cocaptain. He and respondent each received half of the one third of the "catch," to which the boat was entitled, amounting to $19,634.92 for each. As to these items there is no dispute.

In November, 1941, appellant conceived the idea of fishing for soupfin shark with gill nets. He bought some secondhand salmon nets and experimented with them. He caught some shark but the nets soon became torn and useless.

On December 1, 1941, appellant wrote respondent about this idea of using nets to catch shark as follows:

"Hallo Alfred.                    Monday, December 1 1941

"I should have written long ago, but had so much trouble with the boat that I did not feel like writing. The engine was 'shot' when I came down from Alaska so I had to have it fixed in Astoria and I believe they did a good job. It cost almost 600 dollars, but she is running fine now. We were laid up over one month. Since then we have made out quite well, have fished shark with nets. The nets became so poor that I stopped and came to Seattle last Friday. I have now ordered new nets, but it will take two weeks before I get them. I also bought cable and balloon and drift float as we did in the olden days after herring. It will be lots of work to fix the new nets, I thought we might get ready by February so that we could start again as the weather is also better then. If you have nothing else to do would you come and help? Then you could go with us fishing. We can not run the risk of renting the boat out any more. We must

either sell it or be with the boat, one of us. I thought that you might take the boat this summer. It looks like it would be more profitable to fish for shark than anything else. Many boats here are buying nets now and want to fish shark only. Write soon so that I will know what you want. The engine is running fine now.

"Best greetings form us all,

> "Karl Gerde
> 3243 W. 64
> Seattle, Wash."

Apparently respondent did not receive this letter in ordinary course and appellant, having meanwhile obtained delivery of the materials for assembling the nets, again wrote respondent on January 9, 1942:

"Hallo Alfred.                    Seattle January 9. 1942

"Thanks for letter which I received two days ago. I am supraised to learn that you have not received the letter which I wrote to you about two months ago. I see that you mailed me a letter 4 months ago. I have not received any. It was about the time we moved to Seattle as we arrived in Seattle August 28. I see from your letter that you have been on a long trip. Well, you were lucky that the Japanese did not take you. When I wrote you I told you a bit regarding the boat, but since you did not receive the letter I shall have to write it again. When I came from Alaska, the boat was out fishing Tuna, and had made two trips. I went on board and on the way out, so I noticed that the engine was not at its best, but it went slow speed so I figured we had to try to fish for a few days as the price was good. We were out 5 days and had almost 4 tons. When we came in we took the engine to pieces, had two men from a machine shop. There were lots of things wrong, all bearings were gone. We laid there one month so it was a large bill. Atlas and Buda refused to pay, so I guess we have to pay it. After the engine was finished there were no more tunas, so we went shark fishing. Used net drifting, the same as we did for herring at home. We made out quite well the time we were out. We closed about the 20 of November. The weather got so bad and the nets we had were just rags. I bought some old salmon nets in Astoria. I wrote you and told you what my plans were when I came to Seattle and wanted to hear what you thought, but since I did not get any reply I had to do something. I ordered new nets and have gotten them now so I am busy getting them ready. How this will work now after the war is on is hard to say, it probably will be difficult

to drift. There are many who have made out fine with nets, especially in California. It will cost quite a lot. They are also making out fine with lines and all kinds of fish is high now. So I got a man to take the boat out now until I am ready with the nets. They went out today to fish with lines. I would like to talk to you. Take a trip up here as there are many things to talk about. Best greeting Karl and family. (I ordered 2.000 fathoms nets — will be about 1200 when they are finished."

These shark nets are of two kinds: bottom nets (which are placed vertically in the ocean with the weighted lower edge resting on the bottom and left there for two or three days), and drift nets (which are also placed vertically in the ocean with the upper edge supported by floats about seventy feet below the surface, the nets drifting while still connected with the fishing boat). The assembly and use of bottom nets are described in detail in the Pacific Fisherman (January, 1943, p. 18) and the same information regarding drift nets is contained in the March, 1943, issue (p. 21) of the same publication. These articles are illustrated with photographs of the "Princess" and her sets of shark nets.

The total cost of these nets and of keeping them in repair during the period from January, 1942, to March, 1946, was $20,872.54. During this period appellant, without the knowledge of respondent, took one half of the boat's one-third share of the "catch" as rental for the use of these nets. The gross amount received by him was $37,705.42. His theory appears to be that since respondent did not expressly authorize the purchase of the nets, they belonged exclusively to appellant and he was entitled to half of the boat's share as rental for their use. When the "Princess" was sold, appellant disposed of the nets for $7,000, which he retained, in addition to the rental ($37,705.42). The profit resulting from the use and sale of these nets was $23,832.88, which was retained by appellant. Half of this sum is claimed by respondent in this suit.

Appellant's testimony sought to justify his position by indicating that respondent knew that the nets belonged to appellant. He claimed that he had orally asked respondent

prior to December 1, 1941, to go in on the net venture. Later, in his testimony, he claimed that he had written a letter (which had become lost) to that effect.

Respondent, in his testimony, denied the statements made by appellant. The trial court had these parties before it for seven days and heard them testify. The court determined that respondent's version of what transpired was entitled to greater credibility than that of appellant, and we, trying the case *de novo*, have determined from our independent examination of the evidence that its findings as to these matters are adequately supported by the evidence.

When the "Princess" was sold in March, 1946, respondent received from appellant nine thousand dollars (being one-half of the sale price) and learned for the first time that appellant claimed to own the nets. Appellant's letter advising him of this claim was as follows:

"Hallo Alfred:              Seattle, Wash. March 21. 1946
  "Thanks for the letter, which we received some time ago. Well I can now tell you that Princess is sold. I must say that I did not feel very much like selling, but as you know, it is impossible to get anybody you can trust to take care of the boat. I have had lots of trouble this year. This winter we have not earned anything, only expenses have we had. Weather bad all the time. We have some money coming yet from the Liver Poll, will probably get them in a few months I am sending you a check for 9.000.- for half of the boat and all that was with the boat when we bought The nets for shark fishing I have bought from the time we fist started, have paid all expenses myself, there was lots of work with it, *so that if you should own part of it and pay for everything, I believe you would have been in debt.* I have been in the hole the two last winters. Last year I lost everything for 4000.- and this winter I have a loss of 1.500.-. *So the profit is not big.* We have kept accounts and everything is squared now except a bit of money we still can expect from the poll. All accounts are according to the regulations of the Union. If you some time come up here you can go through the books. Well, this will be all for now.
  "Best greetings from us all
                    Karl and family." (Italics ours.)

When appellant wrote this letter he had received a profit from the use and sale of the shark nets (after deducting all

costs of acquisition and expenses of repairs—exclusive of appellant's labor) amounting to $23,832.88. Consequently, his statement that, if respondent had owned an interest in the nets and had paid his share of the costs and expenses, "I believe you would have been in debt" was entirely false. The truth was that, instead of being "in debt" with respect to the nets, respondent would have had one-half of $23,-832.88 or $11,916.44 as his profit.

After receiving this letter from appellant, respondent felt hurt and at first thought he would charge the whole matter up to experience but later decided to insist on his legal rights. He consulted his present attorneys in August, 1947, and they wrote appellant demanding an accounting.

Turning now to a consideration of appellant's assignments of error, the first assignment is that the court erred in denying appellant's demand for a jury trial. Rem. Rev. Stat., § 314 [P.P.C. § 97-11], provides that an issue of fact in an action for the recovery of money *only* shall be tried by a jury unless a jury is waived.

The nature of this action must be determined from the pleadings before the trial court at the time it ruled upon respondent's motion to strike appellant's demand for a jury trial. *Pollock v. Ralston,* 5 Wn. (2d) 36, 104 P. (2d) 934.

At that time the court had before it the complaint which alleged the existence of the partnership and that appellant, as managing partner, had falsely and fraudulently paid himself forty thousand dollars for the use of the shark nets, to respondent's damage in the sum of twenty thousand dollars. Appellant's answer admitted that the parties "were for a time co-partners in the ownership and operation of" the "Princess" on an equal basis.

Under these pleadings, the trial court did not abuse its discretion in striking appellant's demand for a jury trial because this was not an action for the recovery of money only. It was admittedly a suit between partners for the wrongful withholding of partnership profits, which is essentially an equitable proceeding.

Appellant argues that the complaint contained no allegation that a demand for an accounting had been made

and refused and that under *Wiegardt v. Becken*, 8 Wn. (2d) 568, 113 P. (2d) 60, 143 A.L.R. 1208, this is necessary in a suit for an accounting. However, that case was a common-law action of account based on contract and is therefore not in point. Assuming without deciding that in an equitable action for accounting a demand and refusal are necessary, we are satisfied that the partnership relationship (which was admitted in the pleadings) clearly showed that this was a suit of equitable cognizance.

The case of *Gatudy v. Acme Constr. Co.*, 196 Wash. 562, 83 P. (2d) 889 (which appellant contends is controlling), involved solely an issue of fact, to wit, whether the parties had entered into an oral contract of employment. Clearly, it was an action for the recovery of money only. The opinion in the *Gatudy* case expresses the rule which is applicable to the present case in the following language:

█ "It is undoubtedly the rule that, if any one of the main issues in an action is equitable in its nature, the trial court may, in the exercise of its sound discretion, hear the cause as an equitable proceeding."

The second error claimed is that the trial court erred in holding that the parties were partners in connection with the purchase and use of the shark nets.

Appellant argues that the parties were tenants in common as to the boat and not partners, the former being the usual relation between ship owners and the latter the exception (citing 3 Kent's Commentaries (13th ed.) 228). However, in this case, appellant's answer admitted the existence of the partnership in the ownership and operation of the "Princess," so the only question remaining to be determined by the trial court was whether this relationship included the purchase and use of the nets.

Parenthetically, we note that appellant contends that the filing of partnership income tax returns for 1943 and subsequent years by appellant with the collector of internal revenue did not constitute an admission that a partnership existed because the internal revenue code and regulations promulgated thereunder require the filing of partnership returns (Form 1065) by a syndicate, group, pool, joint ven-

ture or other similar organization as well as by an actual partnership. This would have been a valid argument if appellant had not sworn to the following information contained in the 1943 partnership return:

"Name . . . . of the organization  Fishing Boat Princess and Owners . . . . .
"Business . . . . Commercial Fishing

. . . .

"Schedule J. — Partners' Shares of Income and Credits.
"1.  Name and address of each partner . . . .
"Karl O. Gerde (*Managing Partner*)
3243 - West 64th Street,
Seattle 7, Washington
"Alfred Waagen,
Bay Hotel, 24 Sacramento St.,
San Francisco, California

. . . . . . .

"Questions
"1.  Date of organization  Jan. 1, 1939
"2.  Nature of organization (partnership, syndicate, pool, joint venture, etc.) *Partnership*" (Italics ours.)

A copy of this return was sent to respondent and he was justified in believing that he and appellant were actually partners in the business of commercial fishing and were operating the "Princess" as partners.

Coming back to the question of whether the shark nets were a separate venture of appellant and not a partnership activity, the judgment and decree contains this finding:

"It Further Appearing from the accounts and records of the partnership and the accounting thereof that the defendant Karl Gerde, during the life of the partnership, collected all of the proceeds of the partnership business, and from time to time accounted to the plaintiff, but that said accounting to the plaintiff was false and fraudulent, in that said defendant Gerde failed to advise the plaintiff that he was retaining one-half of the proceeds of all shark caught by the partnership for rental to himself for the use of the said nets, to-wit, the sum of $44,705.42; that said defendant charged to said gross amount the cost of said nets and the maintenance thereof, and credited and retained for his own account the sum of $23,832.88; that he fraudulently concealed from the plaintiff the fact that he retained said sums, and that said sums were deducted from the gross earnings of the M/V

PRINCESS, and led the plaintiff to believe that defendant had accounted fully for the earnings of said vessel; that plaintiff did not discover that the defendant Karl Gerde claimed these nets as his separate property and entitled to the earnings thereof until after the 21st day of March, 1946; . . ."

■ This being an equity case, we are trying it *de novo* and it is our function to examine the evidence and determine whether this finding should have been made. *Columbia Lbr. Co. v. Bush*, 13 Wn. (2d) 657, 126 P. (2d) 584. In considering the evidence bearing on this point we think that appellant's letters of December 1, 1941, and January 9, 1942 (above quoted), are strongly indicative of his intention that the shark nets were to be a partnership activity. In the last mentioned letter he said regarding the nets:

"I wrote you and told you what my plans were when I came to Seattle and wanted to hear what you thought, but since I did not get any reply *I had to do something. I ordered new nets* and have gotten them now so I am busy getting them ready. How this will work now after the war is on is hard to say, it probably will be difficult to drift. There are many who have made out fine with nets, especially in California. *It will cost quite a lot.*" (Italics ours.)

Appellant must have considered at the time he wrote this letter that respondent would be charged for his half of the cost of the nets in the same manner as all other equipment had been charged and paid for. Otherwise, it would have been no concern of respondent whether they would "cost quite a lot." At that time the nets had been ordered but not paid for. If appellant desired to obtain respondent's authority to purchase the nets for the partnership, he should have plainly told respondent that unless respondent advised him that he (respondent) desired the partnership to pay for the nets, he (appellant) would undertake the venture personally. Instead of doing so, he wrote this letter which is susceptible of only one interpretation, to wit, that the nets were to be charged to and paid for by the partnership in the same manner as all other fishing gear had been acquired for the boat.

That appellant regarded the purchase of the nets as a partnership transaction is borne out by the way appellant paid for the nets. He bought them from Sunde & d'Evers Co., ship chandlers in Seattle, who sold equipment and supplies and also distributed the proceeds resulting from the sale of the fish caught by the "Princess." The nets were first charged to the existing partnership account designated as "Troller Princess & Owners, Karl Gerde." Some three months later (in March, 1942), appellant opened a new account entitled "Troller Princess & Owners, (Karl Gerde's Personal Account) Netting (Seine) Account." About nine hundred dollars originally charged to the first account was then transferred to the new account at appellant's request.

Kenneth B. Fry, cashier at Sunde & d'Evers Co., had been with that firm for twenty-seven years and had handled appellant's transactions with them since early in 1942 when the "Princess" began shark fishing. He testified that it made no difference in extending credit whether a boat and its owners had one or two or more separate accounts. The firm looked to the boat and owners as their security for all credit extended no matter how many accounts were carried on their books for the same boat.

Mr. Fry further testified that payments on the net account were made by withholding certain amounts from the proceeds of sale of fish caught by the "Princess." Appellant had no funds of his own when he first ordered the nets and had no means of paying for them until fishing became lucrative in the latter part of 1942 and in 1943. If the net venture had been a failure, appellant could not have paid for the nets.

From the evidence above referred to, and other testimony and exhibits in the record, we are convinced that the findings of the trial court, that the parties were partners in connection with the purchase and use of the shark nets, are fully sustained and that appellant's second assignment of error is not well taken.

This being so, the rule stated in *Simich v. Culjak*, 27 Wn. (2d) 403, 178 P. (2d) 336, is applicable here:

"It is the universal rule that partners are required to exercise the utmost good faith toward each other, and, where an accounting is had, it is the duty of a partner who manages, conducts, or operates a partnership business, to render complete and accurate accounts of all of the partnership business. This rule is grounded upon the theory that the managing partner is acting as a trustee for his firm. *Benedetto v. Di Bacco*, 83 W. Va. 620, 99 S.E. 170; *Hatten v. Interocean Oil Co.*, 182 Okla. 465, 78 P. (2d) 392, 116 A.L.R. 727."

See, also, *Salhinger v. Salhinger*, 56 Wash. 134, 105 Pac. 236.

Appellant's final assignment of error is that the trial court erred in refusing to allow appellant any credit for work done by him in constructing the shark nets.

The evidence shows that appellant with some help from his two sons designed and built the shark nets. Respondent did not in any way assist him in this job. According to appellant, the value of this work was twenty-five hundred dollars and he claims that, even though a partnership should be found to exist, he should be compensated for this work.

■ The general rule is clear that one partner is not entitled to extra compensation from the partnership, in the absence of an express or an implied agreement therefor. Each case must depend largely upon its own facts, and thus other cases are generally of little or no assistance in deciding the case at hand.

The exception to the general rule is well stated in 1 Rowley, Modern Law of Partnership 412, § 354, as follows:

" 'Where it can be fairly and justly implied from the course of dealing between the partners, or from circumstances of equivalent force, that one partner is to be compensated for his services, his claim will be sustained.' [*Emerson v. Durand*, 64 Wis. 111, 24 N.W. 129, 54 Am. Rep. 593.] 'The partnership may be of such a peculiar kind, and the arrangements and the course of dealing of the partners in regard to it may be such as pretty plainly to show an expectation and understanding, without an express agreement upon the subject, that certain services of a copartner should be paid for. Such cases, presenting unusual conditions, are exceptions to the general rule [*Hoag v. Alderman*, 184 Mass. 217, 68 N.E. 199],' however."

■ While appellant's ingenuity and industry were largely responsible for the success of the "Princess" in shark fishing, we cannot find anything in the record from which an agreement to pay him special compensation could be implied. Appellant did inform respondent that he was busy getting the nets ready and that it would "be lots of work to fix" them, but never at any time did he inform respondent what the work actually entailed or that he expected any compensation for it. Since respondent had so little knowledge of the conduct of the net operations, there could not be any implied agreement for compensation. The trial court found no factual basis for such an allowance, and we can find none in the record. In *In re Levy's Estate*, 125 Wash. 240, 215 Pac. 811, cited by appellant, this court did not set forth the factual situation under which extra compensation was allowed, and therefore that case cannot be held to be controlling in the present case.

■ Respondent attempts to argue that the amount of the judgment in his favor should be increased by items totaling $655. However, respondent did not cross-appeal and is, therefore, in no position to claim any error in this respect, even though this is an equitable action triable *de novo* in this court. *Shaw v. Briggle*, 193 Wash. 595, 76 P. (2d) 1011.

The facts as found by the trial court are adopted by this court. That court correctly applied the legal principles involved and we find no error in its disposition of the case. Upon our consideration of the entire record, it is ordered that the judgment and decree appealed from be and hereby is affirmed.

SIMPSON, C. J., BEALS, SCHWELLENBACH, and GRADY, JJ., concur.