# CHARLESTON.

R. D. BENEDETTO V. VENANZIO DI BACCO *et al.*

R. D. BENEDETTO V. SALVATORE DI BACCO *et al.*

Submitted March 4, 1919.   Decided March 25, 1919.

1. PARTNERSHIP—*Settlement—Disclosure of Information.*

Partners are required to exercise the utmost good faith toward each other, and in making a settlement of their affairs it is the duty of each partner to fully disclose to the other all the material information which he may have in regard to the partnership business, as well as to refrain from making any false representations in regard thereto.   (p. 629).

2. SAME—*Settlement—Conclusiveness.*

When members of a partnership enter into a settlement of their affairs which is free from fraud, accident or mistake, the same will be upheld, and will be treated as final and binding upon the parties thereto.   (p. 629).

3. SAME—*Correctness of Settlement—Presumption and Burden of Proof.*

A settlement of the affairs of a partnership entered into between the parties, by which their respective interests are fully determined and fixed, is presumptively correct, and a party thereto who would overthrow the same has the burden of showing that it was brought about by fraud, accident or mistake.   (p. 629).

4. SAME—*Reopening Settlement—Accident, Mistake or Fraud.*

A member of a partnership seeking to re-open a settlement of the affairs thereof, upon the ground of accident, mistake or fraud therein, must allege and prove the particular facts wherein such accident, mistake or fraud exists, failing in which his bill will be dismissed.   (p. 629).

5. SAME—*Reopening Statement—Testimony.*

The testimony of one of the partners to such a settlement given several years after the same was made, that certain of the items therein charged against him are not proper charges will not be sufficient to overthrow such a settlement, where it appears that at the time such charges were made, and at the time of entering into the settlement, he was fully cognizant thereof, was advised what they were for, and with such full information as to their nature, the reason therefor, and the amount thereof, approved the same.   Such conduct on his part at the time the charges were made, and at the time he entered into the settlement, will overcome his evidence thereafter given when a dispute has arisen as to the correctness of the settlement.   (p. 630).

**6.**  SAME—*Sale by One Partner—Validity of Settlement.*

The sale by one partner of his interest to his co-partner, the consideration for which sale is determined by the condition of the partnership, as ascertained from a settlement of its affairs made between the parties, will not be set aside, unless it appears that such settlement was the result of fraud, accident or mistake. (p. 633).

**7.**  SAME—*Sale of Interest—Fraud—Recovery.*

Where one partner agrees to relinquish his interest in a firm to his co-partners in consideration that they assume the debts of the concern, and take over its assets, and pay him his share of the earnings up to that time, and by the false representations of his co-partners he is led to believe that there have been no earnings, and transfers his interest relying upon such representations, upon discovering the falsity thereof he is entitled to recover in an appropriate action from his co-partners what he would have received for such interest had they truthfully represented to him the condition of the firm, that is, one-third of its earnings at the time he so disposed of his interest. (p. 633).

**8.**  SAME—*Sale of Interest—Damages—Interest.*

Where one who is a member of a firm parts with his interest therein to his co-partners for an inadequate consideration because of their fraudulent representations, and he recovers the amount to which he was really entitled under the arrangement by which he relinquishes his interest, he will be allowed interest thereon from the time it should have been paid to him until it is actually recovered. The measure of damages in such case for the wrongful detention of his money from him will be the interest thereon. (p. 633).

**9.**  SAME—*Managing Partner—Accounting.*

It is one of the ordinary duties of the managing partner of a mercantile firm to have kept regular books of account showing accurately the condition of the firm, which shall be open at all times to the inspection of all of the partners. (p. 637).

**10.**  SAME—*Accounting—Refusal to Produce Account Books—Basis of Settlement.*

The managing partner of a firm cannot defeat the right of his co-partners to an accounting because of the failure of his books to accurately disclose the rights of the respective partners. The court, in such case, will resort to the best evidence obtainable, and if therefrom a reasonable basis can be established for a settlement, it will be adopted and a settlement made in accordance therewith, resolving all matters of doubt against the partner whose failure to perform his duty makes necessary the resort to such basis of settlement. (p. 637).

11. ATTACHMENT—*Sale—Redemption.*

In decreeing a sale of real estate to satisfy the lien of an attachment thereon, the debtor should be given a reasonable time within which to redeem by paying the amount decreed against him.   (p. 638).

12. COSTS—*Appeal—Failure to Ask for Time to Redeem.*

Where, however, a decree is entered without giving such time to redeem, and the debtor in the court below did not ask that he be allowed such time, and it fairly appears that if it had been asked it would have been allowed him, the decree will be corrected in this court without costs to the appellant.   (p. 638).

Appeal from Circuit Court, Tucker County.

Separate suits by R. D. Benedetto against Venanzio Di Bacco and others, and same plaintiff against Salvatore Di Bacco and others.   Decrees for plaintiff, and defendants appeal.

*Decree in second suit modified and affirmed; in first suit reversed and bill dismissed.*

*A. Jay Valentine, A. R. Stallings, D. E. Cuppett,* and *Conley & Johnson,* for appellants.

*Samuel T. Spears, C. O. Strieby* and *J. Wm. Harman,* for appellee.

RITZ, JUDGE:

These cases involve the settlement of two alleged partnerships.   The same parties were interested in each of the businesses involved, and the cases were heard together in the court below.   The questions arising are somewhat related, and the testimony in many instances is applicable to both cases, for which reason we will consider them together.

We are met at the threshold with a motion to dismiss these appeals for failure to print the record as required by law, and it is also suggested that the brief for appellants does not comply with our rules in that it does not contain a summary or digest of the evidence in narrative form, for which reason it is suggested we should not consider the assignments of error made by appellants.   The records are voluminous, con-

sisting of many hundred pages of oral testimony and more
than a thousand documents introduced in evidence. Only
the pleadings and a small part of the oral testimony have
been printed. The documents offered consist of contracts,
settlements, cancelled checks, vouchers, newspaper articles,
books of account, and sundry other papers. These docu-
ments, together with the oral evidence, after being thoroughly
scrambled, were packed in a box and shipped to this court
with the request that they be considered and examined upon
the hearing, in addition to that part of the record which has
been printed. It might be said further that so much of the
record as has been printed is not arranged in any logical or-
der, nor is it furnished with an index, as required by the
statute. Not only does the record come to us in this unsatis-
factory way, but counsel for the appellants have not given in
their brief a statement of the evidence in narrative form as
required by our rules. The purpose of our rule requiring
briefs of counsel for the appellant to contain a synopsis or
digest of the evidence, was not so much to relieve this court
of labor as it was to have such work done by those thoroughly
familiar with the case. It will be appreciated that a lawyer
who has grown up with a case and understands it in all its
phases, can with very much less labor, and with very much
less liability to error, make a digest of the evidence than a
judge who has never heard of the case before, and it was to
overcome in as large a measure as possible the probability that
error might creep into the determination of important ques-
tions like this, because of the unfamiliarity of judges with
the record, and the difficulty of becoming so familiar with
it that items of evidence of more or less importance might
not be overlooked, or undue importance given to other items
of little consequence. We have considered what would be
the proper course to pursue in a case where the record comes
to us in such unsatisfactory condition as the records in these
cases. It occurred to us that it might be well to set aside the
orders of submission and require the unprinted portions of
the record to be printed, and require counsel to argue them
in accordance with the rule, but such action would result in
further delay in the hearing of the causes, which might be

the thing desired by the appellants next to a favorable decision. It has occurred to us that perhaps the proper course to pursue would be to simply treat the failure of counsel to file a digest of the evidence with the brief. as a confession that the evidence offered fully sustained the contentions of his adversary, and to consider the case no further than to determine whether or not the pleadings and contentions of his adversary justify the decree entered. This might result in injustice in some cases, but if it does it will be the fault of counsel engaged for the particular purpose of protecting the interest of litigants. We have determined, however, not to pursue that course in these cases for two reasons, one being that counsel for the appellants rely upon the evidence to support their contentions, and ask the court in the investigation of the cases to consider all of the various documents and the oral evidence of all the witnesses introduced whether printed or not. This reason is not so persuasive, however, as the other, and that is, that counsel appearing in this court have become so habituated to disregard the rules of practice that to some extent they have fallen into disuse. We have thought, therefore, that it might not be entirely right to visit upon the litigants in these cases the result above indicated, but sound this warning with the hope that in the future counsel generally will exercise care to observe the rules made for the orderly conduct of the business of this court, and thus obviate any unpleasant results which must naturally flow from their continued disregard. We have therefore determined in this instance to overrule the motions to dismiss and to hear the cases upon the entire record as it is presented to us.

The parties to these suits are Italians. The plaintiff Benedetto married a sister of the two defendants, Venanzio Di Bacco and Salvatore Di Bacco. Benedetto is somewhat older than his brothers-in-law, and came to this country prior to their immigration. In 1904 he was established in a small mercantile business in the town of Thomas. His brothers-in-law had been in this country for some little time, and had accumulated from their earnings a small amount of money. It does not appear that this mercantile business was particularly profitable. During this year of 1904 Benedetto admitted his

two brothers-in-law as partners in the business. It was ascertained that a one-third interest was worth the sum of $1420.00. It appears that Salvatore Di Bacco did not have this amount, but he did pay to Benedetto what funds he had, amounting to $700.00, and gave Benedetto an obligation for the balance, $720.00. Venanzio Di Bacco contends that he paid the whole sum of $1420.00 for his interst in the business, but Benedetto claims that he only paid $900.00, and has never paid the other $520.00. Whatever may be the fact in regard to this, it clearly appears that he was always treated as a full partner, and it does not appear that Benedetto ever demanded, or ever considered Venanzio his debtor for the other $520.00. He never claimed it against him in any settlement until after their relations became strained and these suits were brought. After the business had been conducted for about a year under this arrangement, it was ascertained that it had lost a small amount of money, and the parties determined that if their stock could be increased conditions would be improved. Benedetto's contention is that the firm had neither funds nor credit with which to make such an addition to the stock, and that he and one of the defendants went to New York and bought such additional stock as was desired, he paying for the same. He contends that upon his return the amounts that he thus paid out were ascertained, and that each of the defendants gave him a note for one-third of this amount, being $1803.00, and that Salvatore also gave him a note for the sum of $724.50, the balance which he owed him on the original purchase of a one-third interest in the business. These notes, it is admitted, were subsequently paid. The defendants contend that they were given to Benedetto for the purchase of his one-third interest in the business, and that after this transaction which was had in 1905 Benedetto no longer had any connection whatever with this mercantile business. The evidence in regard to this is sharply conflicting, and we will dispose of it later on in this opinion.

In the year 1906, while the mercantile business above referred to was being carried on, as the plaintiff contends by all three of them as partners, and as defendants contend, by the two Di Baccos as partners, the parties determined to en-

ter into the liquor business. With this view they purchased a saloon already established in the town of Thomas. Twenty-four or twenty-five hundred dollars was required for the purchase and this money was advanced by Benedetto with the understanding that it would be repaid to him out of the first profits made in the business, and before any distribution thereof among the partners. Benedetto contends that Salvatore Di Bacco was not interested in this saloon business, and that the partnership therein was between him and Venanzio Di Bacco alone, Venanzio being entitled to one-half of the profits arising therefrom, and he being entitled to the other half thereof, while the defendants contend that all three of the parties were partners in this business, each being entitled to a one-third thereof. It does not appear that Benedetto ever made this contention until just before the bringing of these suits. During all of the time that this business was being conducted he fully recognized both of the Di Baccos as partners, and in all divisions of profits they were each recognized as entitled to one-third thereof. We think it is established without material contradiction that Benedetto's contention in this regard is an afterthought, and is supported by no evidence except some admissions which were made by the Di Baccos in an effort to get a settlement, without litigation, of their affairs with Benedetto. It is shown without dispute that during the first year the saloon business ran Benedetto was fully repaid the money which he advanced for the purchase of the business. It sufficiently appears that during the time this business was being conducted Benedetto withdrew from it considerable sums, not only in money, but in goods furnished at his instance to other parties and charged to him. He was erecting a building of considerable proportions which it is stated cost some forty-odd thousand dollars, and during this time there was furnished to him from the saloon business, as contended by the Di Baccos, all the business would stand. According to their contention they even went to the extent of postponing payment of some of their obligations in order to meet the demands of Benedetto for money. It seems that about the time Benedetto completed his building he became weakened financially, and as he contends his

health also became somewhat impaired.    At any rate, he returned to Italy, the Di Baccos claim for the purpose of seeing if he could raise some money to meet his pressing obligations.    It appears, in addition to being interested in these businesses, he was also engaged in the business of private banker and broker, his patrons being his fellow countrymen, and that considerable unrest was caused among his patrons on account of Benedetto's inability to promptly return deposits made with him.    While he was gone to Italy his brothers-in-law, the defendants, claim that they continued to advance considerable sums of money on his behalf.    They say that he asked them before leaving to do the best they could to take care of his affairs in his absence, and he does not controvert this, nor does he deny that large sums of money were paid out of the saloon business to protect his property interests while he was absent.    When he returned from Italy after an absence of some three months he was met at Cumberland by one of the defendants.    In answer to Benedetto's inquiry he was informed that his affairs were getting in better shape, but that it would still require money to tide him over.    He stated that he had been unable to secure any money in Italy, and asked if it would be possible to secure any in Cumberland from the breweries with which the saloon had been doing business.    This matter was taken up and arrangements made to borrow three thousand dollars from two breweries in Cumberland on Benedetto's note endorsed by the Di Baccos.    This money was turned over to Benedetto and used to relieve the pressure against him.    It was subsequently paid off out of the saloon business and charged to Benedetto.    In the year 1910 a settlement was had of the saloon business with a view of determining how each of the parties stood.    It was found in this settlement that Benedetto had withdrawn from the business more than $11,000.00, and had paid out on its account, out of his personal funds, some five or six hundred dollars, leaving him indebted to the business in the sum of about $10,500.00.    It was then determined in this settlement that he was indebted to each of the Di Baccos to the extent of one-third of this amount, and the Di Baccos claim that he then and there agreed, in

consideration of this indebtedness being cancelled, to with-
draw from the saloon business and turn it over to them, he
being relieved of any further liability, and surrendering any
prospective profits. This is strenuously denied by Benedetto.
Subsequently, however, in the year 1913, after Benedetto
had been advanced four or five thousand dollars more by
the Di Baccos, he executed a paper reciting that he was no
longer interested in the saloon business; that in considera-
tion of eleven thousand dollars which he owed the Di Bacco
brothers he relinquished to them his interest in the saloon,
and would also be without responsibility for its debts after
that time. The Di Baccos contend that this paper was
simply the expression in writing of the agreement had be-
tween the parties in 1910. Benedetto, however, insists that
this is not true; that this paper executed in 1913 was the
written expression of an agreement had between the parties
at that time by which he did agree to transfer his interest
in the saloon business to the Di Baccos for the eleven thous-
and dollars which he had theretofore received from that
business, as shown by the settlement. It is not very material
which contention is correct, for if Benedetto's contention is
true that he did transfer his interest for the consideration
stipulated, then he has no right to demand a settlement of
the partnership, and the same is also true should the conten-
tion of the Di Baccos in that regard be correct. But Bene-
detto claims that the settlement, upon the faith of which he
made this sale of his interest to the Di Baccos, is fraudulent;
that he was deceived by the Di Baccos in many particulars;
and claims that he had a right to set aside this transfer of
his interest because of this fraud. He also relies upon a
paper which it is contended was executed by all of the par-
ties, in which it is agreed that in case there is dissatisfaction
with any settlement theretofore had between them any of
them shall have the right to have a re-statement, and mis-
takes corrected in accordance with law. The Di Baccos very
strenuously insist that they never executed this paper, that
it is a forgery, while Benedetto insists that it was executed,
and that because of it he has a right to go behind this pur-
ported sale made by him upon the basis of a settlement which

he says is fraudulent. A mass of evidence is taken, both to support as well as to overthrow this questioned document. According to our view it is not very material whether it was ever executed or not. Assuming that it was executed it only gave Benedetto a right to have the settlements opened in case there was error in them, and to have them stated according to law. This was his right in any event. If the Di Baccos made a settlement with him based upon false and fraudulent representations upon their part, and on the strength of such settlement procured him to sell his interest in the business to them, he would be entitled to have that sale set aside and the accounts re-stated whether or not this paper is genuine, and if it is genuine his rights would be no different, so that we think all of the testimony offered directed to establishing the genuineness of this paper, as well as that offered to prove that it is fictitious, is not at all material in the determination of the controversy here. That there was a settlement made of the affairs of this saloon in 1910 is beyond dispute, and that Benedetto transferred his interest in the saloon to the Di Baccos by the paper given in 1913 is likewise not denied. Whether or not this paper was but the expression of a contract had in 1910, or whether it was the expression of a contract made at that time, is entirely immaterial, if it was procured without any fraud on the part of the Di Baccos. If Benedetto, with full knowledge of the condition of the business, without any concealment on the part of the Di Baccos as to the true nature of affairs, executed this paper in evidence of a contract of sale which was then made to the parties, he cannot now set aside that contract and have the partnership affairs re-opened and restated. It is very well established that a settlement made by partners of their accounts will be conclusive between them, unless the one seeking to avoid the effect of such settlement shows that it was procured by fraud, or is the result of mistake or accident, and the burden of showing the grounds for setting aside the settlement is upon the one who attacks it. *Mahnke* v. *Neale,* 23 W. Va. 57; *Calwell* v. *Caperton,* 27 W. Va. 397; *Holt* v. *Holt,* 46 W. Va. 397; *Batson* v. *Findley,* 52 W. Va. 343. From these authorities it appears

that the one attacking such a settlement must point out clearly wherein it is in error. It does not suffice for him to say that fraud and misrepresentation were practiced upon him, or that there are mistakes in the settlement, but he must point out the particular items in the settlement which are wrong, and if he claims that he was fraudulently induced to enter into it he must point out and allege the practices that were indulged in which he claims were fraudulent, and the effect thereof. Counsel for the plaintiff recognize this to be the law, and they attempt to overcome the presumption in favor of the correctness of this settlement. Benedetto says that there are a number of items in the settlement made in 1910 charged to him upon the statement of Venanzio Di Bacco, who was the managing partner of the saloon business, that were incorrect charges, while the Di Baccos are as positive that every item therein charged is a correct and proper charge against him. Benedetto attempts to show by his own testimony that some of these charges are incorrect. He makes up a statement and files it containing the items which he claims are improper charges, and he swears that they were improperly charged to him upon books of the company. Some of these items are for cash which was supplied to him; some of them are for debts of his that were paid by the saloon; some of them are for merchandise furnished from the saloon upon Benedetto's orders. In addition to his own evidence he produced several witnesses to whom it is claimed money and merchandise were furnished upon Benedetto's orders, some of whom state that they have no recollection of getting any such articles of merchandise for which Benedetto was responsible, and some of them state that to the best of their recollection all they ever got from the saloon was paid for by themselves. These witnesses are testifying after the lapse of some eight or ten years and their memory as shown by their evidence is very uncertain, and they are not at all definite as to their transactions and their relations to the items charged. However, if there was nothing else in the case except the evidence of Benedetto, and these witnesses introduced on his behalf, it might be said that he had sustained the burden of proof, and that this would

be enough to overcome the settlement deliberately entered into. We are not called upon, however, to say whether it would or not, because of the character of the evidence introduced on behalf of the defendants in support of the settlement. It is shown that this settlement made in 1910 was written down by Benedetto himself; that the items were called off to him from a book on which they had been entered, and as each item was called off he entered it upon a paper on which the settlement was made, and he did not at that time question any of the items charged in the settlement. Of course, it is a little strange that within a very short time after it is contended these charges came into being Benedetto would admit them in a settlement with full knowledge of their character without question, if they were false and fraudulent. He says he did this, however simply because Venanzio Di Bacco told him they were correct, but the items themselves are of such character that he was bound to know whether or not they were correct. Many of them were for money furnished directly to him. Some of them were for payments alleged to have been made upon his debts, and the others charges of merchandise furnished at his instance. He knew whether these items of money had been paid to him; he knew whether he had given orders to the various persons whose names are given for the merchandise charged against him; he knew it then better than he knows it now, and he cannot be heard to say that what he approved, with full knowledge of all the facts, constitutes a fraud upon him. In addition to this it is shown that these items were kept in the books of the concern in an account against Benedetto, that they covered several pages in several different books. It is shown that from time to time, as the charges were made, Benedetto's attention was called to them and he went over them, and that he in his own handwriting approved each separate page of the book upon which the charges are made. He admits that he did this. These facts, taken together with the positive testimony of Venanzio Di Bacco that every one of these items charged against Benedetto are correct, fully establishes the fact that Benedetto received the eleven thousand and odd dollars which the

books show he did.  He contends further that there was
fraud in the transaction by which he parted with his in-
terest in this business to the Di Baccos, because he says
Venanzio represented to him from time to time that there
were no profits in the saloon business; that it was earning
nothing; and made him believe when he sold out his interest
that it was something of no particular value . This state-
ment is denied by Venanzio Di Bacco, but this denial might
not be so forcible were it not for the fact that Benedetto had
received over eleven thousand dollars from this business
himself, and the parties at the time the settlement was made,.
as is shown by the settlement itself, treated this amount that
Benedetto received as profits of the business up to that
time.   The Di Baccos claim that Benedetto withdrew from
the business everything that was made in it, and they still
contend that to be the case; and in view of the fact, ad-
mitted by Benedetto, that he got eleven thousand dollars out
of this business, how can he be heard to say that he was de-
frauded by a statement that the business had made no prof-
its?   But he insists that while he may have gotten eleven
thousand dollars for his interest in the business, this was
not nearly as much as it was worth.   We do not think this
contention is very tenable.   The learned judge of the trial
court held that an account should be re-stated between the
parties as to this saloon business, and after a careful review
of all the evidence submitted to him he found that Bene-
detto's share of such profits was $10,410.00, and decreed
against the Di Baccos that amount.   In entering this decree
the profits of the business were ascertained to be $31,230.00.
This decree leaves out of consideration, however, the fact
that Benedetto admits that he received out of the business
more than the sum which was decreed in his favor.   If the
court below was correct in saying that this sale to the Di
Baccos should be set aside and the account re-stated, ac-
cording to the evidence in this case Benedetto owed each of
the Di Baccos a small balance on account of what he with-
drew from the firm, instead of the Di Baccos being indebted
to him.   We call attention to the court's finding of $10,410.00
as Benedetto's one-third of the profits more particularly for

the purpose of showing that the settlement made by the parties themselves was substantially in accord with the settlement made by the circuit court. The fact that the settlement of these parties found that eleven thousand dollars was the value of Benedetto's interest, and the circuit court found that $10,410.00 was the value of such interest, is very strong evidence in support of the settlement made by the parties.

Again, Benedetto complains that Venanzio Di Bacco withdrew from the business liquors and other supplies for himself, and did not charge them to himself. He shows by his own evidence, however, that he knew all about this at the time he made the settlement, and made no objection in the world thereto at that time. The amount of these withdrawals is not shown, but in view of the fact that Benedetto had full knowledge thereof at the time he made the settlement, and did not complain of the same at that time, convinces us that they were so immaterial as not to have been considered worthy of note by the interested parties. At any rate we would not be justified in setting aside an account deliberately made up by the parties with full knowledge of all the facts because of the omission of such items, when their amount is not shown, and their effect upon the settlement does not appear.

The general mercantile business in which the parties were engaged above referred to was conducted entirely separate and apart from the saloon business which we have been discussing. It seems that after Benedetto and the two Di Baccos became partners in this mercantile business Salvatore Di Bacco became the managing partner thereof. The contention of the two Di Baccos is that they bought out the interest of Benedetto in 1905, each of them paying to him therefor the sum of $1803.00, or rather giving him their notes for this amount, which were subsequently paid. Benedetto, however, denies this contention. He admits they gave him these notes, but he contends that they were given to him not in purchase of his interest in the business, but simply to cover two-thirds of the amount advanced out of

his own funds for the purchase of stock for the partnership.
He contends that at the time these notes were given considerable amounts of goods were purchased and put into
the business in order to make it profitable, and that he paid
for these goods, and when the amount was ascertained each
of the Di Baccos gave him a note for one-third of the same.
Of course, the Di Baccos deny this, and insist that the partnership terminated at that time. Much evidence has been
introduced to establish the subsequent conduct of the parties in regard thereto. For instance it is shown that the
firm name was not changed, but that after 1905 the business
continued to be conducted under the firm name of R. D.
Benedetto & Company. This is a circumstance, of course,
tending to show that there had been no change in the parties
composing it, but it is not conclusive. It is further shown
that after this time and for a number of years, in fact up
until 1912, the managing partner, Salvatore Di Bacco, made
reports to various mercantile agencies in which he stated
over his signature that Benedetto was a partner in the business, and gave Benedetto's individual assets as a basis for
obtaining credit for the firm. This fact, if Benedetto was
not a member of the firm, convicts Salvatore Di Bacco of very
gross fraud in dealing with his creditors and, of course,
we will not put an interpretation upon his acts which can
have that effect if we can find a more innocent one for them.
It is further shown that Benedetto after 1905 frequent'y
drew checks upon the firm's account and obtained the money
thereon, and this with the full knowledge and without objection from Salvatore Di Bacco. This is entirely inconsistent
with the statement that Benedetto was not interested in the
business. It is further shown that Benedetto frequently
ordered merchandise for the store, and that large amounts
of merchandise was shipped to Benedetto individually, and
was received and paid for by the store. These facts, we
think, are so potent as to entirely overcome the testimony of
the Di Baccos that Benedetto was not a partner, and we are
forced to the conclusion that this partnership was not dissolved in the year 1905, or rather that the Di Baccos did not
acquire Benedetto's interest at that time. We do gather from

the evidence, however, that the partnership business con-
tinued under the name of R. D. Benedetto & Co. until the
year 1913. It satisfactorily appears that from the year 1913
the business was conducted under the firm name of Di Bacco
Brothers, with the full knowledge of Benedetto. Represen-
tations were made that the two Di Baccos were the sole
partners in the business, likewise with his full knowledge.
Benedetto never assumed to have any interest in the busi-
ness after that time; he never undertook to exercise any
voice in its control or management, as he had theretofore.
He ceased to draw checks upon its funds as he had there'.)-
fore; he discontinued to purchase goods for it. In fact,
while he denies that he withdrew from the business then, no
other deduction can be drawn from the record in this case
but that Benedetto withdrew from this partnership at the
time of the change of the firm name. This was the finding
of the court below from the evidence, and we think it is am-
ply justified. It is quite clear from the evidence, however,
that he expected to be paid his part of the firm's earnings
at that time. We think the only conclusion reasonably to
be drawn is that Benedetto disposed of his interest to the
Di Baccos for one-third of the profits theretofore accrued,
and that he did not receive this consideration. He claims
that this was because of the fraudulent and false represen-
tations of the Di Baccos that the firm had made no profits:
that he did not know the truth in regard thereto at that
time, and relied solely upon the representations made to
him by Salvatore Di Bacco. It does not appear, and the Di
Baccos do not contend that Benedetto received anything for
retiring from the firm in 1913, but they do deny that they
made any representations to him that there were no profits
in the business; in fact their contention is that he was in no
wise interested in it. We think the court below very cor-
rectly found the existence of this partnership until that time.
The evidence in this case convinces us that Benedetto never
would have surrendered his interest in the year 1913 as he
did unless he was deceived in the manner in which he indi-
cates. There is much evidence to support this conclusion.
We will not undertake to review it. It suffices to say that

the court below found the facts to be that the partnership existed until that time, and that Benedetto had been deceived into turning it over to the Di Baccos without an accounting to him for his interest in it, believing that he had no interest because of the fact that nothing had been made.

Criticism is made of the action of the court in fixing the amount to which Benedetto is entitled. The court below determined that because of the false representations made by the Di Baccos, they should pay him one-third of what the business had earned up to the time he retired therefrom. Benedetto does not ask that that arrangement be set aside, and he does not ask that the partnership be restored. He only asks and he desires to have his share of the money earned. This partnership was one at will. It might be dissolved by the partners at any time. One of the parties may sell his interest to the others and if the transaction is free from fraud the purchase price agreed upon for such interest will be the measure of his interest in the partnership, and receipt of this item will exclude him from further participation therein. If, however, one of the parties is induced to part with his interest in the business upon representations that are false, he is entitled to be made whole. A partner so making such representations will not be allowed to profit by them. In this case the court below undertook to give effect to the agreement of the parties. That was that Benedetto would retire from the business by receiving one-third of the profits thereof, the Di Baccos, of course, to take over the stock of goods and to pay the debts. This would seem to be entirely equitable in this case. If the Di Baccos had told the truth, and there had been no profits in this business, then Benedetto could not maintain this suit. Having found that there was fraud in procuring Benedetto to make this sale, will the court treat that agreement as not made at all, and put the partners back together again, and treat the business thereafter conducted as a partnership and Benedetto entitled to participate therein? In considering this question it must be borne in mind that Benedetto made no claim of any fraud in this matter for about three years. He allowed

the Di Baccos to go on with the conduct of the business as though the agreement he made with them was entirely free from fraud, and was perfectly valid and binding. Ordinarily where one partner excludes another from the partnership business and carries it on himself, such excluded partner will be entitled to share in the profits earned after his exclusion, as well as before, but this is not a case like that. Benedetto was willing to retire from the business. What he wanted when he retired was his share of what the business had earned. This the Di Baccos were willing to give him, but he claims they misrepresented the facts to him in this regard, and by reason of these representations he did not receive what he was entitled to under the agreement he had made, and the court proceeded to execute this agreement and make the Di Baccos pay him in accordance therewith. We think this was the correct solution of the transaction. Criticism is made of the court's findings by both sides, the plaintiff contending that the court should have found a larger amount in his favor, and the Di Baccos contending that the evidence did not justify the court in finding any amount as profits due Benedetto. The evidence introduced is not entirely satisfactory as to just what profits the business made, and were if not for the fact that Salvatore Di Bacco was the managing partner and responsible for the proper conduct of the business and the proper keeping of the books, it might be that the court would not be justified in decreeing against the Di Baccos upon the unsatisfactory state of the evidence, but it must be borne in mind that Benedetto was not actively engaged in the management of it. Salvatore Di Bacco was the managing partner. It was his duty to keep such records as would disclose to Benedetto the true state of affairs, and what his real interest was. If he failed to do this the court was warranted in ascertaining this interest from the evidence which was obtainable, even though it might not convince to a mathematical certainty that the court's decree is right. 20 R. C. L., 1011, 30 Cyc. 742; Lindley on Partnership, 467. It is true there is one theory of the case upon which the court might have found a sum somewhat larger than he did find as Benedetto's one-third of the profits, but

where two or more conclusions may be deduced from the evidence because of the uncertain character thereof, this court will not reverse the decree because some other deduction might be made than that which was made by the court below, provided always that the conclusion reached by the lower court is justified by the evidence, and is one which can reasonably be drawn therefrom. We are, therefore, of opinion that the court's finding that Benedetto was entitled to receive $7,291.66 upon the dissolution of the partnership on the 21st day of January, 1913, is as near correct as any ascertainment that can now be made. Complaint is made, however, by the appellee that the court did not allow him interest upon this amount from the date it should have been paid until the date of the decree. We think the court erred in this regard. This money was due Benedetto at the time he withdrew from the partnership. It was withheld from him because of the fraud of the Di Baccos. They have had it during that time and the measure of damages for their wrongful detention of it is the interest on it. The decree should be for the sum of $9,358.63, with interest on it from its date, to-wit, Nov. 13, 1917, and we will correct the same in this regard.

The appellants complain of the action of the court in decreeing a sale of their real estate in satisfaction of the decree without giving them a day to redeem. It has been held in this jurisdiction that in a suit to enforce judgment liens, trust deed liens, or liens by way of mortgage, it is error to decree a sale of the property without giving the debtor a day within which to redeem. *King* v. *Burdett,* 44 W. Va. 561; *Rose* v. *Brown,* 11 W. Va. 122; *Rohrer* v. *Travers,* 11 W. Va. 146; *Pecks* v. *Chambers,* 8 W. Va. 210. We confess we can see no very substantial reason for this holding. It is, perhaps, because the pendency of suits affecting the debtor's property, and the uncertainty of the amount of the liens for which the same may be sold, renders it difficult for the debtor to secure the funds necessary to relieve it from the liens, and the law in its tenderness to embarrassed debtors has seen fit to reasonably extend this time beyond that at which the amount is definitely determined. This is the only ground

upon which the doctrine can be based, and there is, of course, as much reason for applying it to a sale of real estate in a decree to enforce an attachment lien as to enfore any other sort of lien. We are, therefore, of opinion that the court should have given to the Di Baccos a reasonable time within which to pay off the decree against them before their property would be advertised for sale. It does not appear, however, that this was asked. In fact, it is fairly deducible from the record that if it had been requested it would have been allowed by the court below. This being so we will correct the decree in this regard, but will not award costs to the appellants, in accordance with the doctrine announced in the case of *Freeman* v. *Swiger*, 83 W. Va. ...... decided at this term of this court, and authorities there cited.

Our decree here will reverse the decree of the circuit court in the first above entitled cause, and dismiss the plaintiff's bill. In the second above entitled cause we will correct the amount of the decree as above indicated, and will also correct it giving the defendants thirty days from the entry of the decree here within which to discharge the amount decreed against them, failing in which the sale provided under the decree shall be proceeded with.

*Decree in second suit modified and affirmed; in first suit reversed and bill dismissed.*